908 A.2d 196

MARK LEWIS AND DENNIS WINSLOW; SAUNDRA HEATH AND CLARITA ALICIA TOBY; CRAIG HUTCHISON AND CHRIS LODEWYKS; MAUREEN KILIAN AND CINDY MENEGHIN; SARAH AND SUYIN LAEL; MARILYN MANEELY AND DIANE MARINI; AND KAREN AND MARCYE NICHOLSON–MCFADDEN, PLAINTIFFS–APPELLANTS, v. GWENDOLYN L. HARRIS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF HUMAN SERVICES; CLIFTON R. LACY, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF HEALTH AND SENIOR SERVICES; AND JOSEPH KOMOSINSKI, IN HIS OFFICIAL CAPACITY AS ACTING STATE REGISTRAR OF VITAL STATISTICS OF THE NEW JERSEY STATE DEPARTMENT OF HEALTH AND SENIOR SERVICES, DEFENDANTS–RESPONDENTS.

Argued February 15, 2006—Decided October 25, 2006.

416

418

*David S. Buckel,* a member of the New York bar, argued the cause for appellants (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Buckel, Susan L. Sommer,* a member of the New York bar, *Lawrence S. Lustberg* and *Megan Lewis,* on the briefs).

*Patrick DeAlmeida,* Assistant Attorney General argued the cause for respondents (*Anne Milgram,* Acting Attorney General of New Jersey, attorney; *Mr. DeAlmeida* and *Mary Beth Wood,* on the briefs).

*David R. Oakley* submitted a brief on behalf of amicus curiae Alliance for Marriage, Inc. (*Anderl & Oakley,* attorneys).

*Edward L. Barocas,* Legal Director, submitted a brief on behalf of amici curiae American Civil Liberties Union of New Jersey,

American–Arab Anti–Discrimination Committee, Asian American Legal Defense and Education Fund, Hispanic Bar Association of New Jersey, and The National Organization for Women of New Jersey.

*Howard M. Nashel* submitted a brief on behalf of amici curiae American Psychological Association and New Jersey Psychological Association (*Nashel, Kates, Nussman, Rapone & Ellis,* attorneys).

*Franklyn C. Steinberg, III,* submitted a brief on behalf of amicus curiae The Anscombe Society at Princeton University.

*Douglas S. Eakeley* submitted a brief on behalf of amicus curiae City of Asbury Park (*Lowenstein Sandler,* attorneys).

*Kevin H. Marino* and *John A. Boyle* submitted a brief on behalf of amici curiae Asian Equality, Equality Federation, People for the American Way Foundation and Vermont Freedom to Marry Task Force (*Marino & Associates,* attorneys; *Paul A. Saso,* of counsel).

*Mark L. Hopkins* submitted a brief on behalf of amicus curiae Clergy of New Jersey.

*Richard F. Collier, Jr.,* submitted a brief on behalf of amicus curiae Family Leader Foundation (*Collier & Basil,* attorneys).

*Dennis M. Caufield* submitted a brief on behalf of amicus curiae Family Research Council.

*Leslie A. Farber* and *Thomas H. Prol* submitted a brief on behalf of amici curiae Garden State Equality Education Fund, Inc. and Garden State Equality, LLC, a Continuing Political Committee (*Leslie A. Farber,* attorneys; *Mr. Prol,* of counsel).

*Alan E. Kraus* submitted a brief on behalf of amici curiae Human Rights Campaign, Human Rights Campaign Foundation, Children of Lesbians and Gays Everywhere (COLAGE), Family Pride Coalition, Freedom to Marry, Gay & Lesbian Advocates & Defenders (GLAD), National Center for Lesbian Rights, National Gay and Lesbian Task Force, New Jersey Lesbian and Gay Coalition (NJLGC), and Parents, Families and Friends of Lesbians and Gays (PFLAG) (*Latham & Watkins,* attorneys).

*Kevin Costello* submitted a brief on behalf of amicus curiae Legal Momentum (*Levow & Costello,* attorneys).

*Cliona A. Levy* submitted a brief on behalf of amicus curiae Madeline Marzano–Lesnevich (*Sonnenschein Nath & Rosenthal,* attorneys).

*Demetrios K. Stratis* submitted a brief on behalf of amici curiae Monmouth Rubber & Plastics, Corp. and John M. Bonforte, Sr., (*Demetrios K. Stratis,* attorneys; *Mr. Stratis* and *Vincent P. McCarthy,* on the brief).

*Stephen M. Orlofsky* and *Jordana Cooper* submitted a brief on behalf of amici curiae National Association of Social Workers and National Association of Social Workers New Jersey Chapter (*Blank Rome,* attorneys).

*Steven G. Sanders* submitted a brief on behalf of amicus curiae National Black Justice Coalition (*Arseneault, Fassett & Mariano,* attorneys).

*Robert R. Fuggi, Jr.,* submitted a brief on behalf of amicus curiae National Legal Foundation (*Fuggi & Fuggi,* attorneys).

*Michael Behrens* submitted a brief on behalf of amici curiae The New Jersey Coalition to Preserve and Protect Marriage, The New Jersey Family Policy Council and The New Jersey Catholic Conference (*Messina & Laffey,* attorneys).

*Debra E. Guston* and *Trayton M. Davis,* a member of the New York bar, submitted a brief on behalf of amici curiae New Jersey Religious Leaders and National and Regional Religious Organizations in Support of Marriage (*Guston & Guston,* attorneys).

*Stuart A. Hoberman,* President, submitted a brief on behalf of amicus curiae New Jersey State Bar Association (*Mr. Hoberman,* attorney; *Felice T. Londa, Andrew J. DeMaio, Gail Oxfeld Kanef, Robert A Knee, Scott A. Laterra* and *Thomas J. Snyder,* on the brief).

*R. William Potter* submitted a brief on behalf of amici curiae Princeton Justice Project and Undergraduate Student Govern-

ment of Princeton University (*Potter and Dickson,* attorneys; *Mr. Potter* and *Linda A. Colligan,* on the brief).

*Michael P. Laffey* submitted a brief on behalf of amicus curiae Professors of Psychology and Psychiatry.

*Adam N. Saravay* submitted a brief on behalf of amicus curiae Professors of the History of Marriage, Families, and the Law (*McCarter & English,* attorneys; *Mr. Saravay* and *Sydney E. Dickey,* on the brief).

*Donald D. Campbell* submitted a letter in lieu of brief on behalf of amici curiae United Families International and United Families–New Jersey (*Campbell & Campbell,* attorneys).

*Ralph Charles Coti* submitted a brief on behalf of amici curiae James Q. Wilson, Douglas Allen, Ph.D., David Blankenhorn, Lloyd R. Cohen, J.D., Ph.D., John Coverdale, J.D., Nicholas Eberstadt, Ph.D., Robert P. George, J.D., Harold James, Ph.D., Leon R. Kass, M.D., Ph.D., Douglas W. Kmiec and Katherine Shaw Spaht (*Coti & Segrue,* attorneys).

Justice ALBIN delivered the opinion of the Court.

The statutory and decisional laws of this State protect *individuals* from discrimination based on sexual orientation. When those individuals are gays and lesbians who follow the inclination of their sexual orientation and enter into a committed relationship with someone of the same sex, our laws treat them, as *couples,* differently than heterosexual couples. As committed same-sex partners, they are not permitted to marry or to enjoy the multitude of social and financial benefits and privileges conferred on opposite-sex married couples.

In this case, we must decide whether persons of the same sex have a fundamental right to marry that is encompassed within the concept of liberty guaranteed by Article I, Paragraph 1 of the New Jersey Constitution. Alternatively, we must decide whether Article I, Paragraph 1's equal protection guarantee requires that committed same-sex couples be given on equal terms the legal benefits and privileges awarded to married heterosexual couples

and, if so, whether that guarantee also requires that the title of marriage, as opposed to some other term, define the committed same-sex legal relationship.

Only rights that are deeply rooted in the traditions, history, and conscience of the people are deemed to be fundamental. Although we cannot find that a fundamental right to same-sex marriage exists in this State, the unequal dispensation of rights and benefits to committed same-sex partners can no longer be tolerated under our State Constitution. With this State's legislative and judicial commitment to eradicating sexual orientation discrimination as our backdrop, we now hold that denying rights and benefits to committed same-sex couples that are statutorily given to their heterosexual counterparts violates the equal protection guarantee of Article I, Paragraph 1. To comply with this constitutional mandate, the Legislature must either amend the marriage statutes to include same-sex couples or create a parallel statutory structure, which will provide for, on equal terms, the rights and benefits enjoyed and burdens and obligations borne by married couples. We will not presume that a separate statutory scheme, which uses a title other than marriage, contravenes equal protection principles, so long as the rights and benefits of civil marriage are made equally available to same-sex couples. The name to be given to the statutory scheme that provides full rights and benefits to same-sex couples, whether marriage or some other term, is a matter left to the democratic process.

I.

A.

Plaintiffs are seven same-sex couples who claim that New Jersey's laws, which restrict civil marriage to the union of a man and a woman, violate the liberty and equal protection guarantees of the New Jersey Constitution. Each plaintiff has been in a "permanent committed relationship" for more than ten years and each seeks to marry his or her partner and to enjoy the legal,

financial, and social benefits that are afforded by marriage. When the seven couples applied for marriage licenses in the municipalities in which they live, the appropriate licensing officials told them that the law did not permit same-sex couples to marry. Plaintiffs then filed a complaint in the Superior Court, Law Division, challenging the constitutionality of the State's marriage statutes.

In terms of the value they place on family, career, and community service, plaintiffs lead lives that are remarkably similar to those of opposite-sex couples.[1] Alicia Toby and Saundra Heath, who reside in Newark, have lived together for seventeen years and have children and grandchildren. Alicia is an ordained minister in a church where her pastoral duties include coordinating her church's HIV prevention program. Saundra works as a dispatcher for Federal Express.

Mark Lewis and Dennis Winslow reside in Union City and have been together for fourteen years. They both are pastors in the Episcopal Church. In their ministerial capacities, they have officiated at numerous weddings and signed marriage certificates, though their own relationship cannot be similarly sanctified under New Jersey law. When Dennis's father was suffering from a serious long-term illness, Mark helped care for him in their home as would a devoted son-in-law.

Diane Marini and Marilyn Maneely were committed partners for fourteen years until Marilyn's death in 2005.[2] The couple lived in Haddonfield, where Diane helped raise, as though they were her own, Marilyn's five children from an earlier marriage. Diane's mother considered Marilyn her daughter-in-law and Marilyn's children her grandchildren. The daily routine of their lives mirrored those of "other suburban married couples [their] age."

---

[1] The following sketches of plaintiffs' lives come from affidavits submitted to the trial court in 2003 and from factual assertions in the complaint. We assume that their familial relationships remain unchanged.

[2] As a result of Marilyn's passing, Diane, who remains a party to this action, seeks only declaratory relief.

Marilyn was a registered nurse. Diane is a businesswoman who serves on the planning board in Haddonfield, where she is otherwise active in community affairs.

Karen and Marcye Nicholson–McFadden have been committed partners for seventeen years, living together for most of that time in Aberdeen. There, they are raising two young children conceived through artificial insemination, Karen having given birth to their daughter and Marcye to their son. They own an executive search firm where Marcye works full-time and Karen at night and on weekends. Karen otherwise devotes herself to daytime parenting responsibilities. Both are generally active in their community, with Karen serving on the township zoning board.

Suyin and Sarah Lael have resided together in Franklin Park for most of the sixteen years of their familial partnership. Suyin is employed as an administrator for a non-profit corporation, and Sarah is a speech therapist. They live with their nine-year-old adopted daughter and two other children who they are in the process of adopting. They legally changed their surname and that of their daughter to reflect their status as one family. Like many other couples, Suyin and Sarah share holidays with their extended families.

Cindy Meneghin and Maureen Kilian first met in high school and have been in a committed relationship for thirty-two years. They have lived together for twenty-three years in Butler where they are raising a fourteen-year-old son and a twelve-year-old daughter. Through artificial insemination, Cindy conceived their son and Maureen their daughter. Cindy is a director of web services at Montclair State University, and Maureen is a church administrator. They are deeply involved in their children's education, attending after-school activities and PTA meetings. They also play active roles in their church, serving with their children in the soup kitchen to help the needy.

Chris Lodewyks and Craig Hutchison have been in a committed relationship with each other since their college days thirty-five years ago. They have lived together in Pompton Lakes for the

last twenty-three years. Craig works in Summit, where he is an investment asset manager and president of the Summit Downtown Association. He also serves as the vice-chairman of the board of trustees of a YMCA camp for children. Chris, who is retired, helps Craig's elderly mother with daily chores, such as getting to the eye doctor.

The seeming ordinariness of plaintiffs' lives is belied by the social indignities and economic difficulties that they daily face due to the inferior legal standing of their relationships compared to that of married couples. Without the benefits of marriage, some plaintiffs have had to endure the expensive and time-consuming process of cross-adopting each other's children and effectuating legal surname changes. Other plaintiffs have had to contend with economic disadvantages, such as paying excessive health insurance premiums because employers did not have to provide coverage to domestic partners, not having a right to "family leave" time, and suffering adverse inheritance tax consequences.

When some plaintiffs have been hospitalized, medical facilities have denied privileges to their partners customarily extended to family members. For example, when Cindy Meneghin contracted meningitis, the hospital's medical staff at first ignored her pleas to allow her partner Maureen to accompany her to the emergency room. After Marcye Nicholson–McFadden gave birth to a son, a hospital nurse challenged the right of her partner Karen to be present in the newborn nursery to view their child. When Diane Marini received treatment for breast cancer, medical staff withheld information from her partner Marilyn "that would never be withheld from a spouse or even a more distant relative." Finally, plaintiffs recount the indignities, embarrassment, and anguish that they as well as their children have suffered in attempting to explain their family status.[3]

---

[3] While plaintiffs' appeal was pending before the Appellate Division, the Legislature enacted the Domestic Partnership Act, *L.* 2003, *c.* 246, affording certain rights and benefits to same-sex couples who enter into domestic partner-

## B.

In a complaint filed in the Superior Court, plaintiffs sought both a declaration that the laws denying same-sex marriage violated the liberty and equal protection guarantees of Article I, Paragraph 1 of the New Jersey Constitution and injunctive relief compelling defendants to grant them marriage licenses.[4] The defendants named in the complaint are Gwendolyn L. Harris, the then Commissioner of the New Jersey Department of Human Services responsible for implementing the State's marriage statutes; Clifton R. Lacy, the then Commissioner of the New Jersey Department of Health and Senior Services responsible for the operation of the State Registrar of Vital Statistics; and Joseph Komosinski, the then Acting State Registrar of Vital Statistics of the Department of Health and Senior Services responsible for supervising local registration of marriage records.[5] The departments run by those officials have oversight duties relating to the issuance of marriage licenses.

The complaint detailed a number of statutory benefits and privileges available to opposite-sex couples through New Jersey's civil marriage laws but denied to committed same-sex couples. Additionally, in their affidavits, plaintiffs asserted that the laws prohibiting same-sex couples to marry caused harm to their dignity and social standing, and inflicted psychic injuries on them, their children, and their extended families.

---

ships. With the passage of the Act and subsequent amendments, some of the inequities plaintiffs listed in their complaint and affidavits have been remedied. *See* discussion *infra* Part IV.A–B. For example, under the Domestic Partnership Act, same-sex domestic partners now have certain hospital visitation and medical decision-making rights. *N.J.S.A.* 26:8A–2(c).

[4] The initial complaint in this case was filed on June 26, 2002. That complaint was replaced by the "amended complaint" now before us. All references in this opinion are to the amended complaint.

[5] Each defendant was sued in his or her official capacity and therefore stands as an alter ego of the State. For the sake of simplicity, we refer to defendants as "the State."

The State moved to dismiss the complaint for failure to state a claim upon which relief could be granted, *see R.* 4:6–2(e), and later both parties moved for summary judgment, *see R.* 4:46–2(c). The trial court entered summary judgment in favor of the State and dismissed the complaint.

In an unpublished opinion, the trial court first concluded that marriage is restricted to the union of a man and a woman under New Jersey law. The court maintained that the notion of "same-sex marriage was so foreign" to the legislators who in 1912 passed the marriage statute that "a ban [on same-sex marriage] hardly needed mention." The court next rejected plaintiffs' argument that same-sex couples possess a fundamental right to marriage protected by the State Constitution, finding that such a right was not so rooted in the collective conscience and traditions of the people of this State as to be deemed fundamental. Last, the court held that the marriage laws did not violate the State Constitution's equal protection guarantee. The court determined that "limiting marriage to mixed-gender couples is a valid and reasonable exercise of government authority" and that the rights of gays and lesbians could "be protected in ways other than alteration of the traditional understanding of marriage." Plaintiffs were attempting "not to lift a barrier to marriage," according to the court, but rather "to change its very essence." To accomplish that end, the court suggested that plaintiffs would have to seek relief from the Legislature, which at the time was considering the passage of a domestic partnership act.

C.

A divided three-judge panel of the Appellate Division affirmed. *Lewis v. Harris,* 378 *N.J.Super.* 168, 194, 875 *A.*2d 259 (App.Div. 2005). Writing for the majority, Judge Skillman determined that New Jersey's marriage statutes do not contravene the substantive due process and equal protection guarantees of Article I, Paragraph 1 of the State Constitution. *Id.* at 188–89, 875 *A.*2d 259. In analyzing the substantive due process claim, Judge Skillman con-

cluded that "[m]arriage between members of the same sex is clearly not a fundamental right." *Id.* at 183, 875 *A.*2d 259 (internal quotation marks omitted). He reached that conclusion because he could find no support for such a proposition in the text of the State Constitution, this State's history and traditions, or contemporary social standards. *Id.* at 183–84, 875 *A.*2d 259. He noted that "[o]ur leading religions view marriage as a union of men and women recognized by God" and that "our society considers marriage between a man and woman to play a vital role in propagating the species and in providing the ideal environment for raising children." *Id.* at 185, 875 *A.*2d 259.[6]

In rebuffing plaintiffs' equal protection claim, Judge Skillman looked to the balancing test that governs such claims—a consideration of " 'the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.' " *Id.* at 189, 875 *A.*2d 259 (quoting *Greenberg v. Kimmelman*, 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985)). Starting with the premise that there is no fundamental right to same-sex marriage, Judge Skillman reasoned that plaintiffs could not demonstrate the existence of an "affected" or "claimed" right. *Id.* at 189–90, 875 *A.*2d 259 (internal quotation marks omitted). From that viewpoint, the State was not required to show that a public need for limiting marriage to opposite-sex couples outweighed a non-existent affected right to same-sex marriage. *Id.* at 190, 875 *A.*2d 259.

Judge Skillman chronicled the legislative progress made by same-sex couples through such enactments as the Domestic Partnership Act and expressed his view of the constricted role of judges in setting social policy: "A constitution is not simply an empty receptacle into which judges may pour their own conceptions of evolving social mores." *Id.* at 176–79, 875 *A.*2d 259. In

---

6 It should be noted that the "Attorney General disclaim[ed] reliance upon promotion of procreation and creating the optimal environment for raising children as justifications for the limitation of marriage to members of the opposite sex." *Id.* at 185 n. 2, 875 *A.*2d 259.

the absence of a constitutional mandate, he concluded that only the Legislature could authorize marriage between members of the same sex. *Id.* at 194, 875 *A.2d* 259. Judge Skillman, however, emphasized that same-sex couples "may assert claims that the due process and equal protection guarantees of [the State Constitution] entitle them to additional legal benefits provided by marriage." *Ibid.*

In a separate opinion, Judge Parrillo fully concurred with Judge Skillman's reasoning, but added his view of the twofold nature of the relief sought by plaintiffs—"the right *to* marry and the rights *of* marriage." *Id.* at 194–95, 875 *A.2d* 259 (Parrillo, J., concurring). Judge Parrillo observed that the right to marry necessarily includes significant "economic, legal and regulatory benefits," the so-called rights of marriage. *Id.* at 195, 875 *A.2d* 259. With regard to those "publicly-conferred tangible [and] intangible benefits" incident to marriage that are denied to same-sex couples, Judge Parrillo asserted plaintiffs are free to challenge "on an ad-hoc basis" any "particular statutory exclusion resulting in disparate or unfair treatment." *Ibid.* He concluded, however, that courts had no constitutional authority to alter "a core feature of marriage," namely "its binary, opposite-sex nature." *Id.* at 199–200, 875 *A.2d* 259. He maintained that "[p]rocreative heterosexual intercourse is and has been historically through all times and cultures an important feature of that privileged status, and that characteristic is a fundamental, originating reason why the State privileges marriage." *Id.* at 197, 875 *A.2d* 259. He submitted that it was the Legislature's role "to weigh the societal costs against the societal benefits flowing from a profound change in the public meaning of marriage." *Id.* at 200, 875 *A.2d* 259.

In dissenting, Judge Collester concluded that the substantive due process and equal protection guarantees of Article I, Paragraph 1 obligate the State to afford same-sex couples the right to marry on terms equal to those afforded to opposite-sex couples. *Id.* at 218–20, 875 *A.2d* 259 (Collester, J., dissenting). He charted the evolving nature of the institution of marriage and of the rights

and protections afforded to same-sex couples, and reasoned that outdated conceptions of marriage "cannot justify contemporary violations of constitutional guarantees." *Id.* at 206–10, 875 *A.*2d 259. He described the majority's argument as circular: Plaintiffs have no constitutional right to marry because this State's laws by definition do not permit same-sex couples to marry. *Id.* at 204, 875 *A.*2d 259. That paradigm, Judge Collester believed, unfairly insulated the State's marriage laws from plaintiffs' constitutional claims and denied "plaintiffs the right to enter into lawful marriage in this State with the person of their choice." *Id.* at 204, 211, 875 *A.*2d 259. Judge Collester dismissed the notion that "procreation or the ability to procreate is central to marriage" today and pointed out that four plaintiffs in this case gave birth to children after artificial insemination. *Id.* at 211–12, 875 *A.*2d 259. He further asserted that if marriage indeed is "the optimal environment for child rearing," then denying plaintiffs the right to marry their committed partners is fundamentally unfair to their children. *Id.* at 212–13, 875 *A.*2d 259 (internal quotation marks omitted). Because the current marriage laws prohibit "a central life choice to some and not others based on sexual orientation" and because he could find no rational basis for limiting the right of marriage to opposite-sex couples, Judge Collester determined that the State had deprived plaintiffs of their right to substantive due process and equal protection of the laws. *Id.* at 216–20, 875 *A.*2d 259.

We review this case as of right based on the dissent in the Appellate Division. *See R.* 2:2–1(a)(2). We granted the motions of a number of individuals and organizations to participate as amici curiae.

## II.

This appeal comes before us from a grant of summary judgment in favor of the State. *See R.* 4:46–2(c). As this case raises no factual disputes, we address solely questions of law, and thus are not bound to defer to the legal conclusions of the lower

courts. *See Balsamides v. Protameen Chems., Inc.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999) (stating that "matters of law are subject to a *de novo* review").

Plaintiffs contend that the State's laws barring members of the same sex from marrying their chosen partners violate the New Jersey Constitution. They make no claim that those laws contravene the Federal Constitution. Plaintiffs present a twofold argument. They first assert that same-sex couples have a fundamental right to marry that is protected by the liberty guarantee of Article I, Paragraph 1 of the State Constitution. They next assert that denying same-sex couples the right to marriage afforded to opposite-sex couples violates the equal protection guarantee of that constitutional provision.

In defending the constitutionality of its marriage laws, the State submits that same-sex marriage has no historical roots in the traditions or collective conscience of the people of New Jersey to give it the ranking of a fundamental right, and that limiting marriage to opposite-sex couples is a rational exercise of social policy by the Legislature. The State concedes that state law and policy do not support the argument that limiting marriage to heterosexual couples is necessary for either procreative purposes or providing the optimal environment for raising children.[7] Indeed, the State not only recognizes the right of gay and lesbian parents to raise their own children, but also places foster children in same-sex parent homes through the Division of Youth and Family Services.

The State rests its case on age-old traditions, beliefs, and laws, which have defined the essential nature of marriage to be the union of a man and a woman. The long-held historical view of marriage, according to the State, provides a sufficient basis to uphold the constitutionality of the marriage statutes. Any change to the bedrock principle that limits marriage to persons of the

---

[7] Unlike the Appellate Division, we will not rely on policy justifications disavowed by the State, even though vigorously advanced by amici curiae.

opposite sex, the State argues, must come from the democratic process.

The legal battle in this case has been waged over one overarching issue—the right to marry. A civil marriage license entitles those wedded to a vast array of economic and social benefits and privileges—the rights of marriage. Plaintiffs have pursued the singular goal of obtaining the right to marry, knowing that, if successful, the rights of marriage automatically follow. We do not have to take that all-or-nothing approach. We perceive plaintiffs' equal protection claim to have two components: whether committed same-sex couples have a constitutional right to the benefits and privileges afforded to married heterosexual couples, and, if so, whether they have the constitutional right to have their "permanent committed relationship" recognized by the name of marriage. After we address plaintiffs' fundamental right argument, we will examine those equal protection issues in turn.

### III.

Plaintiffs contend that the right to marry a person of the same sex is a fundamental right secured by the liberty guarantee of Article I, Paragraph 1 of the New Jersey Constitution. Plaintiffs maintain that the liberty interest at stake is "the right of every adult to choose whom to marry without intervention of government." Plaintiffs do not profess a desire to overthrow all state regulation of marriage, such as the prohibition on polygamy and restrictions based on consanguinity and age.[8] They therefore accept some limitations on "the exercise of personal choice in marriage." They do claim, however, that the State cannot regulate marriage by defining it as the union between a man and a

---

[8] Plaintiffs concede that the State can insist on the binary nature of marriage, limiting marriage to one per person at any given time. As Judge Skillman pointed out, polygamists undoubtedly would insist that the essential nature of marriage is the coupling of people of the opposite sex while defending multiple marriages on religious principles. *Lewis, supra,* 378 *N.J.Super.* at 187–88, 875 A.2d 259.

woman without offending our State Constitution. In assessing their liberty claim, we must determine whether the right of a person to marry someone of the same sex is so deeply rooted in the traditions and collective conscience of our people that it must be deemed fundamental under Article I, Paragraph 1. We thus begin with the text of Article I, Paragraph 1, which provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
>
> [*N.J. Const.* art. I, ¶ 1.]

■ The origins of Article I, Paragraph 1 date back to New Jersey's 1844 Constitution.[9] That first paragraph of our Constitution is, in part, "a 'general recognition of those absolute rights of the citizen which were a part of the common law.' " *King v. S. Jersey Nat'l Bank,* 66 *N.J.* 161, 178, 330 *A.*2d 1 (1974) (quoting *Ransom v. Black,* 54 *N.J.L.* 446, 448, 24 *A.* 1021 (Sup.Ct.1892), *aff'd per curiam,* 65 *N.J.L.* 688, 51 *A.* 1109 (E. & A. 1893)). In attempting to discern those substantive rights that are fundamental under Article I, Paragraph 1, we have adopted the general standard followed by the United States Supreme Court in construing the Due Process Clause of the Fourteenth Amendment of the Federal Constitution. We "look to 'the traditions and [collective] conscience of our people to determine whether a principle is so rooted [there] . . . as to be ranked as fundamental.' " *Ibid.* (internal quotation marks omitted) (alterations in original) (quoting *Griswold v. Connecticut,* 381 *U.S.* 479, 493, 85 *S.Ct.* 1678, 1686, 14 *L.Ed.*2d 510, 520 (1965) (Goldberg, J., concurring)); *see also Watkins v. Nelson,* 163 *N.J.* 235, 245, 748 *A.*2d 558 (2000); *Doe v. Poritz,* 142 *N.J.* 1, 120, 662 *A.*2d 367 (1995); *State v. Parker,* 124 *N.J.* 628, 648, 592 *A.*2d 228 (1991), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992).

---

[9] The text of Article I, Paragraph 1 of the 1947 New Jersey Constitution largely parallels the language of the 1844 Constitution. *Compare N.J. Const.* art. I, ¶ 1, *with N.J. Const. of 1844* art. I, ¶ 1.

■ Under Article I, Paragraph 1, as under the Fourteenth Amendment's substantive due process analysis, determining whether a fundamental right exists involves a two-step inquiry. First, the asserted fundamental liberty interest must be clearly identified. *See Washington v. Glucksberg*, 521 *U.S.* 702, 721, 117 *S.Ct.* 2258, 2268, 138 *L.Ed.*2d 772, 788 (1997). Second, that liberty interest must be objectively and deeply rooted in the traditions, history, and conscience of the people of this State. *See King, supra*, 66 *N.J.* at 178, 330 *A.*2d 1; *see also Glucksberg, supra*, 521 *U.S.* at 720–21, 117 *S.Ct.* at 2268, 138 *L.Ed.*2d at 787–88 (stating that liberty interest must be "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" (internal quotation marks omitted)).

How the right is defined may dictate whether it is deemed fundamental. One such example is *Glucksberg, supra*, a case involving a challenge to Washington's law prohibiting and criminalizing assisted suicide. 521 *U.S.* at 705–06, 117 *S.Ct.* at 2261, 138 *L.Ed.*2d at 779. In that case, the Supreme Court stated that the liberty interest at issue was not the " 'liberty to choose how to die,' " but rather the "right to commit suicide with another's assistance." *Id.* at 722–24, 117 *S.Ct.* at 2269, 138 *L.Ed.*2d at 789–90. Having framed the issue that way, the Court concluded that the right to assisted suicide was not deeply rooted in the nation's history and traditions and therefore not a fundamental liberty interest under substantive due process. *Id.* at 723, 728, 117 *S.Ct.* at 2269, 2271, 138 *L.Ed.*2d at 789, 792.

■ The right to marriage is recognized as fundamental by both our Federal and State Constitutions. *See, e.g., Zablocki v. Redhail*, 434 *U.S.* 374, 383–84, 98 *S.Ct.* 673, 679–80, 54 *L.Ed.*2d 618, 628–29 (1978); *J.B. v. M.B.*, 170 *N.J.* 9, 23–24, 783 *A.*2d 707 (2001). That broadly stated right, however, is "subject to reasonable state regulation." *Greenberg, supra*, 99 *N.J.* at 572, 494 *A.*2d 294. Although the fundamental right to marriage extends even to those imprisoned, *Turner v. Safley*, 482 *U.S.* 78, 95–96, 107 *S.Ct.* 2254, 2265, 96 *L.Ed.*2d 64, 83 (1987), and those in noncompliance

with their child support obligations, *Zablocki, supra,* 434 *U.S.* at 387–91, 98 *S.Ct.* at 681–83, 54 *L.Ed.*2d at 631–33, it does not extend to polygamous, incestuous, and adolescent marriages, *N.J.S.A.* 2C:24–1; *N.J.S.A.* 37:1–1, –6. In this case, the liberty interest at stake is not some undifferentiated, abstract right to marriage, but rather the right of people of the same sex to marry. Thus, we are concerned only with the question of whether the right to same-sex marriage is deeply rooted in this State's history and its people's collective conscience.[10]

In answering that question, we are not bound by the nation's experience or the precedents of other states, although they may provide guideposts and persuasive authority. *See Doe v. Poritz, supra,* 142 *N.J.* at 119–20, 662 *A.*2d 367 (stating that although practice "followed by a large number of states is not conclusive[,] ... it is plainly worth considering in determining whether the practice offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" (internal quotation marks omitted)). Our starting point is the State's marriage laws.

Plaintiffs do not dispute that New Jersey's civil marriage statutes, *N.J.S.A.* 37:1–1 to 37:2–41, which were first enacted in 1912, limit marriage to heterosexual couples. That limitation is clear from the use of gender-specific language in the text of various statutes. *See, e.g., N.J.S.A.* 37:1–1 (describing prohibited marriages in terms of opposite-sex relatives); *N.J.S.A.* 37:2–10 (providing that "husband" is not liable for debts of "wife" incurred before or after marriage); *N.J.S.A.* 37:2–18.1 (providing release

---

[10] The dissent posits that we have defined the right too narrowly and that the fundamental right to marry involves nothing less than "the liberty to choose, as a matter of personal autonomy." *Post* at 469, 908 *A.2d* at 228. That expansively stated formulation, however, would eviscerate any logic behind the State's authority to forbid incestuous and polygamous marriages. For example, under the dissent's approach, the State would have no legitimate interest in preventing a sister and brother or father and daughter (assuming child bearing is not involved) from exercising their "personal autonomy" and "liberty to choose" to marry.

rights of curtesy and dower for "husband" and "wife"). More recently, in passing the Domestic Partnership Act to ameliorate some of the economic and social disparities between committed same-sex couples and married heterosexual couples, the Legislature explicitly acknowledged that same-sex couples cannot marry. *See N.J.S.A.* 26:8A–2(e).

Three decades ago, Justice (then Judge) Handler wrote that "[d]espite winds of change," there was almost a universal recognition that "a lawful marriage requires the performance of a ceremonial marriage of two persons of the opposite sex, a male and a female." *M.T. v. J.T.*, 140 *N.J.Super.* 77, 83–84, 355 *A.*2d 204 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1076 (1976). With the exception of Massachusetts, every state's law, explicitly or implicitly, defines marriage to mean the union of a man and a woman.[11]

Although today there is a nationwide public debate raging over whether same-sex marriage should be authorized under the laws or constitutions of the various states, the framers of the 1947 New Jersey Constitution, much less the drafters of our marriage statutes, could not have imagined that the liberty right protected by

---

[11] *Alaska Const.* art. I, § 25; *Ark. Const.* amend. 83, § 1; *Ga. Const.* art. I, § IV, ¶ I; *Haw. Const.* art. I, § 23; *Kan. Const.* art. XV, § 16; *Ky. Const.* § 233a; *La. Const.* art. XII, § 15; *Mich. Const.* art. I, § 25; *Miss. Const.* art. 14, § 263A; *Mo. Const.* art. I, § 33; *Mont. Const.* art. XIII, § 7; *Neb. Const.* art. I, § 29; *Nev. Const.* art. I, § 21; *N.D. Const.* art. XI, § 28; *Ohio Const.* art. XV, § 11; *Okla. Const.* art. II, § 35; *Or. Const.* art. XV, § 5a; *Tex. Const.* art. I, § 32; *Utah Const.* art. I, § 29; *Ala.Code* § 30–1–19; *Ariz.Rev.Stat.* § 25–101; *Cal. Fam.Code* § 308.5; *Colo.Rev.Stat.* § 14–2–104; *Conn. Gen.Stat.* § 45a–727a; *Del.Code Ann. tit.* 13, § 101; *Fla. Stat.* § 741.212; *Idaho Code Ann.* § 32–201; 750 *Ill. Comp. Stat.* 5/201, 5/212; *Ind.Code* § 31–11–1–1; *Iowa Code* § 595.2; *Me.Rev.Stat. Ann. tit.* 19–A, §§ 650, 701; *Md.Code Ann., Fam. Law* § 2–201; *Minn.Stat.* §§ 517.01, 517.03; *N.H.Rev.Stat. Ann.* §§ 457:1, 457:2; *N.J.S.A.* 37:1–1, –3; *N.M. Stat.* § 40–1–18; *N.Y. Dom. Rel. Law* §§ 12, 50; *N.C. Gen.Stat.* §§ 51–1, 51–1.2; 23 *Pa. Cons.Stat.* §§ 1102, 1704; *R.I. Gen. Laws* §§ 15–1–1, 15–1–2, 15–2–1; *S.C.Code Ann.* § 20–1–15; *S.D. Codified Laws* § 25–1–1; *Tenn.Code Ann.* § 36–3–113; *Vt. Stat. Ann. tit.* 15, § 8; *Va.Code Ann.* §§ 20–45.2, 20–45.3; *Wash. Rev.Code* § 26.04.020(1)(c); *W. Va.Code* § 48–2–104(c); *Wis. Stat.* §§ 765.001(2), 765.01; *Wyo. Stat. Ann.* § 20–1–101.

Article I, Paragraph 1 embraced the right of a person to marry someone of his or her own sex. *See, e.g., Baker v. Nelson,* 291 *Minn.* 310, 191 *N.W.*2d 185, 186 (1971) ("The institution of marriage as a union of man and woman ... is as old as the book of Genesis."), *appeal dismissed,* 409 *U.S.* 810, 93 *S.Ct.* 37, 34 *L.Ed.*2d 65 (1972); Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 2–3 (2000) (describing particular model of marriage "deeply implanted" in United States history to be "lifelong, faithful monogamy, formed by the mutual consent of a man and a woman"); *see also* 1 *U.S.C.A.* § 7 (defining under Federal Defense of Marriage Act "the word 'marriage' [to] mean[ ] only a legal union between one man and one woman as husband and wife").

Times and attitudes have changed, and there has been a developing understanding that discrimination against gays and lesbians is no longer acceptable in this State, as is evidenced by various laws and judicial decisions prohibiting differential treatment based on sexual orientation. *See, e.g., N.J.S.A.* 10:5–4 (prohibiting discrimination on basis of sexual orientation); *N.J.S.A.* 26:8A–1 to – 13 (affording various rights to same-sex couples under Domestic Partnership Act); *In re Adoption of a Child by J.M.G.,* 267 *N.J.Super.* 622, 623, 625, 632 *A.*2d 550 (Ch.Div.1993) (determining that lesbian partner was entitled to adopt biological child of partner). *See generally* Joshua Kaplan, *Unmasking the Federal Marriage Amendment: The Status of Sexuality,* 6 *Geo. J. Gender & L.* 105, 123–24 (2005) (noting that "1969 is widely recognized as the beginning of the gay rights movement," which is considered "relatively new to the national agenda"). On the federal level, moreover, the United States Supreme Court has struck down laws that have unconstitutionally targeted gays and lesbians for disparate treatment.

In *Romer v. Evans,* Colorado passed an amendment to its constitution that prohibited all legislative, executive, or judicial action designed to afford homosexuals protection from discrimination based on sexual orientation. 517 *U.S.* 620, 623–24, 116 *S.Ct.* 1620, 1623, 134 *L.Ed.*2d 855, 860–61 (1996). The Supreme Court

declared that Colorado's constitutional provision violated the Fourteenth Amendment's Equal Protection Clause because it "impos[ed] a broad and undifferentiated disability on a single named group" and appeared to be motivated by an "animus toward" gays and lesbians. *Id.* at 632, 116 *S.Ct.* at 1627–28, 134 *L.Ed.*2d at 865–66. The Court concluded that a state could not make "a class of persons a stranger to its laws." *Id.* at 635, 116 *S.Ct.* at 1629, 134 *L.Ed.*2d at 868.

More recently, in *Lawrence v. Texas,* the Court invalidated on Fourteenth Amendment due process grounds Texas's sodomy statute, which made it a crime for homosexuals "to engage in certain intimate sexual conduct." 539 *U.S.* 558, 562, 578, 123 *S.Ct.* 2472, 2475, 2484, 156 *L.Ed.*2d 508, 515, 525–26 (2003). The Court held that the "liberty" protected by the Due Process Clause prevented Texas from controlling the destiny of homosexuals "by making their private sexual conduct a crime." *Id.* at 578, 123 *S.Ct.* at 2484, 156 *L.Ed.*2d at 525. The *Lawrence* Court, however, pointedly noted that the case did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Ibid.* In a concurring opinion, Justice O'Connor concluded that the Texas law, as applied to the private, consensual conduct of homosexuals, violated the Equal Protection Clause, but strongly suggested that a state's legitimate interest in "preserving the traditional institution of marriage" would allow for distinguishing between heterosexuals and homosexuals without offending equal protection principles. *Id.* at 585, 123 *S.Ct.* at 2487–88, 156 *L.Ed.*2d at 530 (O'Connor, J., concurring).

Plaintiffs rely on the *Romer* and *Lawrence* cases to argue that they have a fundamental right to marry under the New Jersey Constitution, not that they have such a right under the Federal Constitution. Although those recent cases openly advance the civil rights of gays and lesbians, they fall far short of establishing a right to same-sex marriage deeply rooted in the traditions, history, and conscience of the people of this State.

Plaintiffs also rely on *Loving v. Virginia,* 388 *U.S.* 1, 87 *S.Ct.* 1817, 18 *L.Ed.*2d 1010 (1967), to support their claim that the right to same-sex marriage is fundamental. In *Loving,* the United States Supreme Court held that Virginia's antimiscegenation statutes, which prohibited and criminalized interracial marriages, violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Id.* at 2, 87 *S.Ct.* at 1818, 18 *L.Ed.*2d at 1012. Although the Court reaffirmed the fundamental right of marriage, the heart of the case was invidious discrimination based on race, the very evil that motivated passage of the Fourteenth Amendment. *Id.* at 10–12, 87 *S.Ct.* at 1823–24, 18 *L.Ed.*2d at 1017–18. The Court stated that "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Id.* at 10, 87 *S.Ct.* at 1823, 18 *L.Ed.*2d at 1017. For that reason, the Court concluded that "restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause." *Id.* at 12, 87 *S.Ct.* at 1823, 18 *L.Ed.*2d at 1018. From the fact-specific background of that case, which dealt with intolerable racial distinctions that patently violated the Fourteenth Amendment, we cannot find support for plaintiffs claim that there is a fundamental right to same-sex marriage under our State Constitution. We add that all of the United States Supreme Court cases cited by plaintiffs, *Loving, Turner,* and *Zablocki,* involved heterosexual couples seeking access to the right to marriage and did not implicate directly the primary question to be answered in this case.

▪ Within the concept of liberty protected by Article I, Paragraph 1 of the New Jersey Constitution are core rights of such overriding value that we consider them to be fundamental. Determining whether a particular claimed right is fundamental is a task that requires both caution and foresight. When engaging in a substantive due process analysis under the Fourteenth Amendment, the United States Supreme Court has instructed that it must "exercise the utmost care" before finding new rights, which

place important social issues beyond public debate, "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of [the] Court." *Glucksberg, supra,* 521 *U.S.* at 720, 117 *S.Ct.* at 2267–68, 138 *L.Ed.*2d at 787 (internal quotation marks omitted). In searching for the meaning of "liberty" under Article I, Paragraph 1, we must resist the temptation of seeing in the majesty of that word only a mirror image of our own strongly felt opinions and beliefs. Under the guise of newly found rights, we must be careful not to impose our personal value system on eight-and-one-half million people, thus bypassing the democratic process as the primary means of effecting social change in this State. That being said, this Court will never abandon its responsibility to protect the fundamental rights of all of our citizens, even the most alienated and disfavored, no matter how strong the winds of popular opinion may blow.

Despite the rich diversity of this State, the tolerance and goodness of its people, and the many recent advances made by gays and lesbians toward achieving social acceptance and equality under the law, we cannot find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people of this State that it ranks as a fundamental right. When looking for the source of our rights under the New Jersey Constitution, we need not look beyond our borders. Nevertheless, we do take note that no jurisdiction, not even Massachusetts, has declared that there is a fundamental right to same-sex marriage under the federal or its own constitution.[12]

---

[12] *See Dean v. District of Columbia,* 653 A.2d 307, 331 (D.C.1995); *Standhardt v. Superior Court of Ariz.,* 206 *Ariz.* 276, 77 *P.*3d 451, 459–60 (App.2003); *Baehr v. Lewin,* 74 *Haw.* 530, 852 *P.*2d 44, 57 (1993); *Morrison v. Sadler,* 821 *N.E.*2d 15, 34 (Ind.Ct.App.2005); *Baker, supra,* 191 *N.W.*2d at 186; *Hernandez v. Robles,* 7 *N.Y.*3d 338, 362–63, 821 *N.Y.S.*2d 770, 855 *N.E.*2d 1 (2006) (plurality opinion); *Andersen v. King County,* 158 *Wash.*2d 1, 27–31, 43–45, 138 *P.*3d 963, 978–79, 986 (2006) (plurality opinion); *see also Goodridge v. Dep't of Pub. Health,* 440 *Mass.* 309, 798 *N.E.*2d 941, 961 (2003) (stating that it was not necessary to reach

Having decided that there is no fundamental right to same-sex marriage does not end our inquiry. *See WHS Realty Co. v. Town of Morristown,* 323 *N.J.Super.* 553, 562–63, 733 *A.*2d 1206 (App. Div.) (recognizing that although provision of municipal service is not fundamental right, inequitable provision of that service is subject to equal protection analysis), *certif. denied,* 162 *N.J.* 489, 744 *A.*2d 1211 (1999). We now must examine whether those laws that deny to committed same-sex couples both the right to and the rights of marriage afforded to heterosexual couples offend the equal protection principles of our State Constitution.

## IV.

Article I, Paragraph 1 of the New Jersey Constitution sets forth the first principles of our governmental charter—that every person possesses the "unalienable rights" to enjoy life, liberty, and property, and to pursue happiness. Although our State Constitution nowhere expressly states that every person shall be entitled to the equal protection of the laws, we have construed the expansive language of Article I, Paragraph 1 to embrace that fundamental guarantee. *Sojourner A. v. N.J. Dep't of Human Servs.,* 177 *N.J.* 318, 332, 828 *A.*2d 306 (2003); *Greenberg, supra,* 99 *N.J.* at 568, 494 *A.*2d 294. Quite simply, that first paragraph to our State Constitution "protect[s] against injustice and against the unequal treatment of those who should be treated alike." *Greenberg, supra,* 99 *N.J.* at 568, 494 *A.*2d 294.

Plaintiffs claim that the State's marriage laws have relegated them to "second-class citizenship" by denying them the "tangible and intangible" benefits available to heterosexual couples through marriage. Depriving same-sex partners access to civil marriage and its benefits, plaintiffs contend, violates Article I, Paragraph 1's equal protection guarantee. We must determine whether the

---

fundamental right issue in light of finding that no rational basis existed for denying same-sex couples right to marry under state constitution).

State's marriage laws permissibly distinguish between same-sex and heterosexual couples.

 When a statute is challenged on the ground that it does not apply evenhandedly to similarly situated people, our equal protection jurisprudence requires that the legislation, in distinguishing between two classes of people, bear a substantial relationship to a legitimate governmental purpose. *Caviglia v. Royal Tours of Am.*, 178 *N.J.* 460, 472–73, 842 *A.*2d 125 (2004); *Barone v. Dep't of Human Servs.*, 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987). The test that we have applied to such equal protection claims involves the weighing of three factors: the nature of the right at stake, the extent to which the challenged statutory scheme restricts that right, and the public need for the statutory restriction. . *Greenberg, supra*, 99 *N.J.* at 567, 494 *A.*2d 294; *Robinson v. Cahill*, 62 *N.J.* 473, 491–92, 303 *A.*2d 273, *cert. denied*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973). The test is a flexible one, measuring the importance of the right against the need for the governmental restriction.[13] *See Sojourner A., supra*, 177 *N.J.* at 333, 828 *A.*2d 306. Under that approach, each claim is examined "on a continuum that reflects the nature of the burdened right and the importance of the governmental restriction." *Ibid.* Accordingly, "the more personal the right, the greater the public need must be to justify governmental interference with the exercise of that right." *George Harms Constr. Co. v. N.J. Tpk. Auth.*, 137 *N.J.* 8, 29, 644 *A.*2d 76 (1994); *see also Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.*, 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976), *cert. denied*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). Unless

---

[13] Our state equal protection analysis differs from the more rigid, three-tiered federal equal protection methodology. When a statute is challenged under the Fourteenth Amendment's Equal Protection Clause, one of three tiers of review applies—strict scrutiny, intermediate scrutiny, or rational basis—depending on whether a fundamental right, protected class, or some other protected interest is in question. *Clark v. Jeter*, 486 *U.S.* 456, 461, 108 *S.Ct.* 1910, 1914, 100 *L.Ed.*2d 465, 471 (1988). All classifications must at a minimum survive rational basis review, the lowest tier. *Ibid.*

the public need justifies statutorily limiting the exercise of a claimed right, the State's action is deemed arbitrary. *See Robinson, supra,* 62 *N.J.* at 491–92, 303 *A.*2d 273.

A.

In conducting this equal protection analysis, we discern two distinct issues. The first is whether committed same-sex couples have the right to the statutory benefits and privileges conferred on heterosexual married couples. Next, assuming a right to equal benefits and privileges, the issue is whether committed same-sex partners have a constitutional right to define their relationship by the name of marriage, the word that historically has characterized the union of a man and a woman. In addressing plaintiffs' claimed interest in equality of treatment, we begin with a retrospective look at the evolving expansion of rights to gays and lesbians in this State.

Today, in New Jersey, it is just as unlawful to discriminate against individuals on the basis of sexual orientation as it is to discriminate against them on the basis of race, national origin, age, or sex. *See N.J.S.A.* 10:5–4. Over the last three decades, through judicial decisions and comprehensive legislative enactments, this State, step by step, has protected gay and lesbian individuals from discrimination on account of their sexual orientation.

In 1974, a New Jersey court held that the parental visitation rights of a divorced homosexual father could not be denied or restricted based on his sexual orientation. *In re J.S. & C.,* 129 *N.J.Super.* 486, 489, 324 *A.*2d 90 (Ch.Div.1974), *aff'd per curiam,* 142 *N.J.Super.* 499, 362 *A.*2d 54 (App.Div.1976). Five years later, the Appellate Division stated that the custodial rights of a mother could not be denied or impaired because she was a lesbian. *M.P. v. S.P.,* 169 *N.J.Super.* 425, 427, 404 *A.*2d 1256 (App.Div.1979). This State was one of the first in the nation to judicially recognize the right of an individual to adopt a same-sex partner's biological

child.[14] *J.M.G., supra,* 267 *N.J.Super.* at 625, 626, 631, 632 *A.*2d 550 (recognizing "importance of the emotional benefit of formal recognition of the relationship between [the non-biological mother] and the child" and that there is not one correct family paradigm for creating "supportive, loving environment" for children); *see also In re Adoption of Two Children by H.N.R.,* 285 *N.J.Super.* 1, 3, 666 *A.*2d 535 (App.Div.1995) (finding that "best interests" of children supported adoption by same-sex partner of biological mother). Additionally, this Court has acknowledged that a woman can be the "psychological parent" of children born to her former same-sex partner during their committed relationship, entitling the woman to visitation with the children. *V.C. v. M.J.B.,* 163 *N.J.* 200, 206–07, 230, 748 *A.*2d 539, *cert. denied,* 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000); *see also id.* at 232, 748 *A.*2d 539 (Long, J., concurring) (noting that no one "particular model of family life" has monopoly on " 'family values' " and that "[t]hose qualities of family life on which society places a premium . . . are unrelated to the particular form a family takes"). Recently, our Appellate Division held that under New Jersey's change of name statute an individual could assume the surname of a same-sex partner. *In re Application for Change of Name by Bacharach,* 344 *N.J.Super.* 126, 130–31, 136, 780 *A.*2d 579 (App.Div.2001).

Perhaps more significantly, New Jersey's Legislature has been at the forefront of combating sexual orientation discrimination and advancing equality of treatment toward gays and lesbians. In 1992, through an amendment to the Law Against Discrimination (LAD), *L.* 1991, *c.* 519, New Jersey became the fifth state [15] in the

---

[14] Unlike New Jersey, a number of states prohibit adoption by same-sex couples. *See* Kari E. Hong, *Parens Patriarchy: Adoption, Eugenics, and Same–Sex Couples,* 40 *Cal. W.L.Rev.* 1, 2–3 (2003) (detailing states that have enacted measures to restrict adoption by same-sex couples).

[15] At the time of New Jersey's amendment, only four other states, Wisconsin, Massachusetts, Connecticut, and Hawaii, had adopted similar anti-discrimination provisions. *See L.* 1981, *c.* 112 (codified at *Wis. Stat.* §§ 111.31 to 111.39 (1982)); *St.* 1989, *c.* 516 (codified at *Mass. Gen. Laws* ch. 151B, §§ 1 to 10

nation to prohibit discrimination on the basis of "affectional or sexual orientation."[16] *See N.J.S.A.* 10:5–4. In making sexual orientation a protected category, the Legislature committed New Jersey to the goal of eradicating discrimination against gays and lesbians. *See also Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 ("[T]he overarching goal of the [LAD] is nothing less than the eradication of the cancer of discrimination." (internal quotation marks omitted)), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). In 2004, the Legislature added "domestic partnership status" to the categories protected by the LAD. *L.* 2003, *c.* 246.

The LAD guarantees that gays and lesbians, as well as same-sex domestic partners, will not be subject to discrimination in pursuing employment opportunities, gaining access to public accommodations, obtaining housing and real property, seeking credit and loans from financial institutions, and engaging in business transactions. *N.J.S.A.* 10:5–12. The LAD declares that access to those opportunities and basic needs of modern life is a civil right. *N.J.S.A.* 10:5–4.

Additionally, discrimination on the basis of sexual orientation is outlawed in various other statutes. For example, the Legislature has made it a bias crime for a person to commit certain offenses with the purpose to intimidate an individual on account of sexual orientation, *N.J.S.A.* 2C:16–1(a)(1), and has provided a civil cause of action against the offender, *N.J.S.A.* 2A:53A–21. It is a crime for a public official to deny a person any "right, privilege, power or immunity" on the basis of sexual orientation. *N.J.S.A.* 2C:30–6(a). It is also unlawful to discriminate against gays and lesbians under

---

(1989)); *Public Act No.* 91–58 (codified at *Conn. Gen.Stat.* §§ 46a–81a to –81r (1991)); *L.* 1991, *c.* 2 (codified at *Haw.Rev.Stat.* §§ 378–1 to 6 (1991)); *L.* 1991, *c.* 519 (codified at *N.J.S.A.* 10:5–1 to –42 (1992)).

16 "Affectional or sexual orientation" is defined to mean "male or female heterosexuality, homosexuality or bisexuality by inclination, practice, identity or expression, having a history thereof or being perceived, presumed or identified by others as having such an orientation." *N.J.S.A.* 10:5–5(hh).

the Local Public Contracts Law and the Public Schools Contracts Law. *N.J.S.A.* 40A:11–13; *N.J.S.A.* 18A:18A–15. The Legislature, moreover, formed the New Jersey Human Relations Council to promote educational programs aimed at reducing bias and bias-related acts, identifying sexual orientation as a protected category, *N.J.S.A.* 52:9DD–8, and required school districts to adopt anti-bullying and anti-intimidation policies to protect, among others, gays and lesbians, *N.J.S.A.* 18A:37–14, –15(a).

In 2004, the Legislature passed the Domestic Partnership Act, *L.* 2003, *c.* 246, making available to committed same-sex couples "certain rights and benefits that are accorded to married couples under the laws of New Jersey." [17] *N.J.S.A.* 26:8A–2(d). With same-sex partners in mind, the Legislature declared that "[t]here are a significant number of individuals in this State who choose to live together in important personal, emotional and economic committed relationships," *N.J.S.A.* 26:8A–2(a), and that those "mutually supportive relationships should be formally recognized by statute," *N.J.S.A.* 26:8A–2(c). The Legislature also acknowledged that such relationships "assist the State by their establishment of a private network of support for the financial, physical and emotional health of their participants." *N.J.S.A.* 26:8A–2(b).

For those same-sex couples who enter into a domestic partnership, the Act provides a limited number of rights and benefits possessed by married couples, including "statutory protection against various forms of discrimination against domestic partners; certain visitation and decision-making rights in a health care setting; certain tax-related benefits; and, in some cases, health and pension benefits that are provided in the same manner as for spouses." *N.J.S.A.* 26:8A–2(c). Later amendments to other statutes have provided domestic partners with additional rights per-

---

[17] The rights and benefits provided by the Domestic Partnership Act extend to two classes of people—persons who "are of the same sex and therefore unable to enter into a marriage with each other that is recognized by New Jersey law" and persons "who are each 62 years of age or older and not of the same sex." *N.J.S.A.* 26:8A–4(b)(5).

taining to funeral arrangements and disposition of the remains of a deceased partner, *L.* 2005, *c.* 331, inheritance privileges when the deceased partner dies without a will, *L.* 2005, *c.* 331, and guardianship rights in the event of a partner's incapacitation, *L.* 2005, *c.* 304.

In passing the Act, the Legislature expressed its clear understanding of the human dimension that propelled it to provide relief to same-sex couples. It emphasized that the need for committed same-sex partners "to have access to these rights and benefits is paramount in view of their essential relationship to any reasonable conception of basic human dignity and autonomy, and the extent to which they will play an integral role in enabling these persons to enjoy their familial relationships as domestic partners." *N.J.S.A.* 26:8A–2(d).

Aside from federal decisions such as *Romer* and *Lawrence,* this State's decisional law and sweeping legislative enactments, which protect gays and lesbians from sexual orientation discrimination in all its virulent forms, provide committed same-sex couples with a strong interest in equality of treatment relative to comparable heterosexual couples.

### B.

We next examine the extent to which New Jersey's laws continue to restrict committed same-sex couples from enjoying the full benefits and privileges available through marriage. Although under the Domestic Partnership Act same-sex couples are provided with a number of important rights, they still are denied many benefits and privileges accorded to their similarly situated heterosexual counterparts. Thus, the Act has failed to bridge the inequality gap between committed same-sex couples and married opposite-sex couples. Among the rights afforded to married couples but denied to committed same-sex couples are the right to

(1) a surname change without petitioning the court, *see Bacharach, supra,* 344 *N.J.Super.* at 135–36, 780 *A.*2d 579;

(2) ownership of property as tenants by the entirety, *N.J.S.A.* 46:3–17.2, which would allow for both automatic transfer of ownership on death, *N.J.S.A.* 46:3–17.5, and protection against severance and alienation, *N.J.S.A.* 46:3–17.4;

(3) survivor benefits under New Jersey's Workers' Compensation Act, *N.J.S.A.* 34:15–13;

(4) back wages owed to a deceased spouse, *N.J.S.A.* 34:11–4.5;

(5) compensation available to spouses, children, and other relatives of homicide victims under the Criminal Injuries Compensation Act, *N.J.S.A.* 52:4B–10(c), –2;

(6) free tuition at any public institution of higher education for surviving spouses and children of certain members of the New Jersey National Guard, *N.J.S.A.* 18A:62–25;

(7) tuition assistance for higher education for spouses and children of volunteer firefighters and first-aid responders, *N.J.S.A.* 18A:71–78.1;

(8) tax deductions for spousal medical expenses, *N.J.S.A.* 54A:3–3(a);

(9) an exemption from the realty transfer fee for transfers between spouses, *N.J.S.A.* 46:15–10(j), –6.1; and

(10) the testimonial privilege given to the spouse of an accused in a criminal action, *N.J.S.A.* 2A:84A–17(2).

In addition, same-sex couples certified as domestic partners receive fewer workplace protections than married couples. For example, an employer is not required to provide health insurance coverage for an employee's domestic partner. *N.J.S.A.* 34:11A–20(b). Because the New Jersey Family Leave Act does not include domestic partners within the definition of family member, *N.J.S.A.* 34:11B–3(j), gay and lesbian employees are not entitled to statutory leave for the purpose of caring for an ill domestic partner, *see N.J.S.A.* 34:11B–4(a). The disparity of rights and remedies also extends to the laws governing wills. For instance, a bequest in a will by one domestic partner to another is not automatically revoked after termination of the partnership, as it would be for a divorced couple, *N.J.S.A.* 3B:3–14. For that reason, the failure to revise a will prior to death may result in an estranged domestic partner receiving a bequest that a divorced spouse would not. There is also no statutory provision permitting the payment of an allowance for the support and maintenance of a surviving domestic partner when a will contest is pending. *See N.J.S.A.* 3B:3–30 (stating that support and maintenance may be paid out of decedent's estate to surviving spouse pending will contest).

The Domestic Partnership Act, notably, does not provide to committed same-sex couples the family law protections available to married couples. The Act provides no comparable presumption of dual parentage to the non-biological parent of a child born to a domestic partner, *N.J.S.A.* 9:17–43, –44.[18] As a result, domestic partners must rely on costly and time-consuming second-parent adoption procedures.[19] The Act also is silent on critical issues relating to custody, visitation, and partner and child support in the event a domestic partnership terminates. *See, e.g., N.J.S.A.* 9:2–4 (providing custody rights to divorced spouses).[20] For example, the Act does not place any support obligation on the non-biological partner-parent who does not adopt a child born during a committed relationship. Additionally, there is no statutory mechanism for post-relationship support of a domestic partner. *See N.J.S.A.* 2A:34–23 (providing for spousal support following filing of matrimonial complaint). Contrary to the law that applies to divorcing spouses, *see N.J.S.A.* 2A:34–23, –23.1, the Act states that a court shall not be required to equitably distribute property acquired by one or both partners during the domestic partnership on termination of the partnership. *N.J.S.A.* 26:8A–10(a)(3).

Significantly, the economic and financial inequities that are borne by same-sex domestic partners are borne by their children too. With fewer financial benefits and protections available, those

---

[18] Every statutory provision applicable to opposite-sex couples might not be symmetrically applicable to same-sex couples. The presumption of parentage would apply differently for same-sex partners inasmuch as both partners could not be the biological parents of the child. It appears that the presumption in such circumstances would be that the non-biological partner consented to the other partner either conceiving or giving birth to a child.

[19] *But see In re Parentage of Child of Robinson,* 383 *N.J.Super.* 165, 176, 890 *A.*2d 1036 (Ch.Div.2005) (declaring that same-sex partner was entitled to statutory presumption of parenthood afforded to husbands).

[20] To obtain custody or visitation rights, the non-biological parent must petition the courts to be recognized as a psychological parent. *See V.C., supra,* 163 *N.J.* at 206, 230, 748 *A.*2d 539 (declaring former lesbian partner of biological mother of twins "psychological parent," and awarding regular visitation).

children are disadvantaged in a way that children in married households are not. Children have the same universal needs and wants, whether they are raised in a same-sex or opposite-sex family, yet under the current system they are treated differently.

Last, even though they are provided fewer benefits and rights, same-sex couples are subject to more stringent requirements to enter into a domestic partnership than opposite-sex couples entering into marriage. The Act requires that those seeking a domestic partnership share "a common residence;" prove that they have assumed joint responsibility "for each other's common welfare as evidenced by joint financial arrangements or joint ownership of real or personal property;" "agree to be jointly responsible for each other's basic living expenses during the domestic partnership;" and show that they "have chosen to share each other's lives in a committed relationship of mutual caring." *N.J.S.A.* 26:8A–4(b)(1), (2), (6). Opposite-sex couples do not have to clear those hurdles to obtain a marriage license. *See N.J.S.A.* 37:1–1 to –12.3.

Thus, under our current laws, committed same-sex couples and their children are not afforded the benefits and protections available to similar heterosexual households.

## C.

We now must assess the public need for denying the full benefits and privileges that flow from marriage to committed same-sex partners. At this point, we do not consider whether committed same-sex couples should be allowed to marry, but only whether those couples are entitled to the same rights and benefits afforded to married heterosexual couples. Cast in that light, the issue is not about the transformation of the traditional definition of marriage, but about the unequal dispensation of benefits and privileges to one of two similarly situated classes of people. We therefore must determine whether there is a public need to deny committed same-sex partners the benefits and privileges available to heterosexual couples.

The State does not argue that limiting marriage to the union of a man and a woman is needed to encourage procreation or to create the optimal living environment for children. Other than sustaining the traditional definition of marriage, which is not implicated in this discussion, the State has not articulated any legitimate public need for depriving same-sex couples of the host of benefits and privileges catalogued in Section IV.B. Perhaps that is because the public policy of this State is to eliminate sexual orientation discrimination and support legally sanctioned domestic partnerships. The Legislature has designated sexual orientation, along with race, national origin, and sex, as a protected category in the Law Against Discrimination. *N.J.S.A.* 10:5–4, –12. Access to employment, housing, credit, and business opportunities is a civil right possessed by gays and lesbians. *See ibid.* Unequal treatment on account of sexual orientation is forbidden by a number of statutes in addition to the Law Against Discrimination.

The Legislature has recognized that the "rights and benefits" provided in the Domestic Partnership Act are directly related "to any reasonable conception of basic human dignity and autonomy." *N.J.S.A.* 26:8A–2(d). It is difficult to understand how withholding the remaining "rights and benefits" from committed same-sex couples is compatible with a "reasonable conception of basic human dignity and autonomy." There is no rational basis for, on the one hand, giving gays and lesbians full civil rights in their status as individuals, and, on the other, giving them an incomplete set of rights when they follow the inclination of their sexual orientation and enter into committed same-sex relationships.

Disparate treatment of committed same-sex couples, moreover, directly disadvantages their children. We fail to see any legitimate governmental purpose in disallowing the child of a deceased same-sex parent survivor benefits under the Workers' Compensation Act or Criminal Injuries Compensation Act when children of married parents would be entitled to such benefits. Nor do we see the governmental purpose in not affording the child of a same-sex parent, who is a volunteer firefighter or first-aid responder,

tuition assistance when the children of married parents receive such assistance. There is something distinctly unfair about the State recognizing the right of same-sex couples to raise natural and adopted children and placing foster children with those couples, and yet denying those children the financial and social benefits and privileges available to children in heterosexual households. Five of the seven plaintiff couples are raising or have raised children. There is no rational basis for visiting on those children a flawed and unfair scheme directed at their parents. To the extent that families are strengthened by encouraging monogamous relationships, whether heterosexual or homosexual, we cannot discern any public need that would justify the legal disabilities that now afflict same-sex domestic partnerships.

There are more than 16,000 same-sex couples living in committed relationships in towns and cities across this State. Ruth Padawer, *Gay Couples, At Long Last, Feel Acknowledged, The Rec.*, Aug. 15, 2001, at 104. Gays and lesbians work in every profession, business, and trade. They are educators, architects, police officers, fire officials, doctors, lawyers, electricians, and construction workers. They serve on township boards, in civic organizations, and in church groups that minister to the needy. They are mothers and fathers. They are our neighbors, our coworkers, and our friends. In light of the policies reflected in the statutory and decisional laws of this State, we cannot find a legitimate public need for an unequal legal scheme of benefits and privileges that disadvantages committed same-sex couples.

### D.

In arguing to uphold the system of disparate treatment that disfavors same-sex couples, the State offers as a justification the interest in uniformity with other states' laws. Unlike other states, however, New Jersey forbids sexual orientation discrimination, and not only allows same-sex couples to adopt children, but also places foster children in their households. Unlike New Jersey, other states have expressed open hostility toward legally recogniz-

ing committed same-sex relationships.[21] *See* Symposium, *State Marriage Amendments: Developments, Precedents, and Significance,* 7 *Fla. Coastal L.Rev.* 403, 403 (2005) (noting that "[s]ince November 1998, nineteen states have passed state marriage amendments ... defining marriage as the union of a man and a woman" and "[v]oters in thirteen states ratified [those amendments] in the summer and fall of 2004 alone and by overwhelming margins").

Today, only Connecticut and Vermont, through civil union, and Massachusetts, through marriage, extend to committed same-sex couples the full rights and benefits offered to married heterosexual couples. *See Conn. Gen.Stat.* §§ 46b–38aa to –38pp; *Vt. Stat. Ann.* tit. 15, §§ 1201–1207; *Goodridge v. Dep't of Pub. Health,* 440 *Mass.* 309, 798 *N.E.*2d 941, 969 (2003). A few jurisdictions, such as New Jersey, offer some but not all of those rights under domestic partnership schemes.[22]

The high courts of Vermont and Massachusetts have found that the denial of the full benefits and protections of marriage to committed same-sex couples violated their respective state constitutions.[23] In *Baker v. State,* the Vermont Supreme Court held

---

[21] A number of states declare that they will not recognize domestic relationships other than the union of a man and a woman, and specifically prohibit any marriage, civil union, domestic partnership, or other state sanctioned arrangement between persons of the same sex. *See, e.g., Ga. Const.* art. I, § IV, ¶ I(b); *Kan. Const.* art. XV, § 16(b); *Ky. Const.* § 233a; *La. Const.* art. XII, § 15; *Mich. Const.* art. I, § 25; *Neb. Const.* art. I, § 29; *N.D. Const.* art. XI, § 28; *Ohio Const.* art. XV, § 11; *Utah Const.* art. I, § 29; *Alaska Stat.* § 25.05.013; *Okla. Stat.* tit. 51, § 255(A)(2); *Tex. Fam.Code Ann.* § 6.204(b); *Va.Code Ann.* § 20–45.3.

[22] *See Cal. Fam.Code* §§ 297–299.6; *Haw.Rev.Stat.* §§ 572C–1 to –7; *Me.Rev. Stat. Ann.* tit. 22, § 2710; *N.J.S.A.* 26:8A–1 to –13; *D.C.Code* §§ 32–701 to –710.

[23] The Hawaii Supreme Court was the first state high court to rule that sexual orientation discrimination possibly violated the equal protection rights of same-sex couples under a state constitution. *See Encyclopedia of Everyday Law, Gay Couples,* http://law.enotes.com/everyday-law-encyclopedia/gay-couples (last visited Oct. 10, 2006). In *Baehr, supra,* the Hawaii Supreme Court concluded that

that same-sex couples are entitled "to obtain the same benefits and protections afforded by Vermont law to married opposite-sex couples" under the Common Benefits Clause of the Vermont Constitution, "its counterpart [to] the Equal Protection Clause of the Fourteenth Amendment." 170 *Vt.* 194, 744 *A.2d* 864, 870, 886 (1999). To remedy the constitutional violation, the Vermont Supreme Court referred the matter to the state legislature. *Id.* at 886. Afterwards, the Vermont Legislature enacted the nation's first civil union law. *See Vt. Stat. Ann.* tit. 15, §§ 1201–1207; *see also* Mark Strasser, *Equal Protection at the Crossroads: On Baker, Common Benefits, and Facial Neutrality*, 42 *Ariz. L.Rev.* 935, 936 n. 8 (2000).

In *Goodridge, supra,* the Supreme Judicial Court of Massachusetts declared that Massachusetts, consistent with its own constitution, could not "deny the protections, benefits, and obligations conferred by civil marriage to two individuals of the same sex who wish to marry." 798 *N.E.2d* at 948. Finding that the State's ban on same-sex marriage did "not meet the rational basis test for either due process or equal protection" under the Massachusetts Constitution, the high court redefined civil marriage to allow two persons of the same sex to marry. *Id.* at 961, 969. Massachusetts is the only state in the nation to legally recognize same-sex marriage.[24] In contrast to Vermont and Massachusetts, Connecti-

---

the marriage statute "discriminates based on sex against the applicant couples in the exercise of the civil right of marriage, thereby implicating the equal protection clause of article I, section 5 of the Hawaii Constitution" and remanded for an evidentiary hearing on whether there was a compelling government interest furthered by the sex-based classification. 852 *P.2d* at 57, 59. After the remand but before the Hawaii Supreme Court had a chance to address the constitutionality of the statute, Hawaii passed a constitutional amendment stating that "[t]he legislature shall have the power to reserve marriage to opposite-sex couples." *Haw. Const.* art. I, § 23. The Hawaii Legislature enacted a statute conferring certain rights and benefits on same-sex couples through a reciprocal beneficiary relationship. *Haw.Rev.Stat.* §§ 572C–1 to –7.

[24] After rendering its decision, the Massachusetts Supreme Judicial Court issued an opinion advising the state legislature that a proposed bill prohibiting

cut did not act pursuant to a court decree when it passed a civil union statute.

Vermont, Massachusetts, and Connecticut represent a distinct minority view. Nevertheless, our current laws concerning same-sex couples are more in line with the legal constructs in those states than the majority of other states. In protecting the rights of citizens of this State, we have never slavishly followed the popular trends in other jurisdictions, particularly when the majority approach is incompatible with the unique interests, values, customs, and concerns of our people. *See New State Ice Co. v. Liebmann*, 285 *U.S.* 262, 311, 52 *S.Ct.* 371, 386–87, 76 *L.Ed.* 747, 771 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). Equality of treatment is a dominant theme of our laws and a central guarantee of our State Constitution, and fitting for a State with so diverse a population. The New Jersey Constitution not only stands apart from other state constitutions, but also "may be a source of 'individual liberties more expansive than those conferred by the Federal Constitution.' " *State v. Novembrino*, 105 *N.J.* 95, 144–45, 519 *A.2d* 820 (1987) (quoting *PruneYard Shopping Ctr. v. Robins*, 447 *U.S.* 74, 81, 100 *S.Ct.* 2035, 2040, 64 *L.Ed.2d* 741, 752 (1980)). Indeed, we have not hesitated to find that our State Constitution provides our citizens with greater rights to privacy, free speech, and equal protection than those available under the United States Constitution. *See, e.g., State v. McAllister*, 184 *N.J.* 17, 26, 32–33, 875 *A.2d* 866 (2005) (concluding

---

same-sex couples from entering into marriage but allowing them to form civil unions would violate the equal protection and due process requirements of the Massachusetts Constitution and Declaration of Rights. *Opinions of the Justices to the Senate*, 440 *Mass.* 1201, 802 *N.E.2d* 565, 566, 572 (2004). The court later upheld the validity of an initiative petition, which if successful would amend the Massachusetts Constitution to define " 'marriage only as the union of one man and one woman.' " *Schulman v. Attorney General*, 447 *Mass.* 189, 850 *N.E.2d* 505, 506–07 (2006).

that New Jersey Constitution recognizes interest in privacy of bank records, unlike Federal Constitution); *N.J. Coal. Against War in the Middle East v. J.M.B. Realty Corp.*, 138 *N.J.* 326, 332, 349, 374, 650 *A.*2d 757 (1994) (holding that free speech protection of New Jersey Constitution requires, subject to reasonable restrictions, privately-owned shopping centers to permit speech on political and societal issues on premises, unlike First Amendment of Federal Constitution), *cert. denied*, 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995); *Right to Choose v. Byrne*, 91 *N.J.* 287, 298, 310, 450 *A.*2d 925 (1982) (holding that restriction of Medicaid funding to those abortions that are "necessary to save the life of the mother" violates equal protection guarantee of New Jersey Constitution although same restriction does not violate United States Constitution).

██ Article I, Paragraph 1 protects not just the rights of the majority, but also the rights of the disfavored and the disadvantaged; they too are promised a fair opportunity "of pursuing and obtaining safety and happiness." *N.J. Const.* art. I, ¶ 1. Ultimately, we have the responsibility of ensuring that every New Jersey citizen receives the full protection of our State Constitution. In light of plaintiffs' strong interest in rights and benefits comparable to those of married couples, the State has failed to show a public need for disparate treatment. We conclude that denying to committed same-sex couples the financial and social benefits and privileges given to their married heterosexual counterparts bears no substantial relationship to a legitimate governmental purpose. We now hold that under the equal protection guarantee of Article I, Paragraph 1 of the New Jersey Constitution, committed same-sex couples must be afforded on equal terms the same rights and benefits enjoyed by married opposite-sex couples.

## V.

██ The equal protection requirement of Article I, Paragraph 1 leaves the Legislature with two apparent options. The Legislature could simply amend the marriage statutes to include same-

sex couples, or it could create a separate statutory structure, such as a civil union, as Connecticut and Vermont have done. *See Conn. Gen.Stat.* §§ 46b–38aa to –38pp; *Vt. Stat. Ann.* tit. 15, §§ 1201–1207.

Plaintiffs argue that even equal social and financial benefits would not make them whole unless they are allowed to call their committed relationships by the name of marriage. They maintain that a parallel legal structure, called by a name other than marriage, which provides the social and financial benefits they have sought, would be a separate-but-equal classification that offends Article I, Paragraph 1. From plaintiffs' standpoint, the title of marriage is an intangible right, without which they are consigned to second-class citizenship. Plaintiffs seek not just legal standing, but also social acceptance, which in their view is the last step toward true equality. Conversely, the State asserts that it has a substantial interest in preserving the historically and almost universally accepted definition of marriage as the union of a man and a woman. For the State, if the age-old definition of marriage is to be discarded, such change must come from the crucible of the democratic process. The State submits that plaintiffs seek by judicial decree "a fundamental change in the meaning of marriage itself," when "the power to define marriage rests with the Legislature, the branch of government best equipped to express the judgment of the people on controversial social questions."

Raised here is the perplexing question—"what's in a name?"—and is a name itself of constitutional magnitude after the State is required to provide full statutory rights and benefits to same-sex couples? We are mindful that in the cultural clash over same-sex marriage, the word marriage itself—independent of the rights and benefits of marriage—has an evocative and important meaning to both parties. Under our equal protection jurisprudence, however, plaintiffs' claimed right to the name of marriage is surely not the same now that equal rights and benefits must be conferred on committed same-sex couples.

 We do not know how the Legislature will proceed to remedy the equal protection disparities that currently exist in our statutory scheme. The Legislature is free to break from the historical traditions that have limited the definition of marriage to heterosexual couples or to frame a civil union style structure, as Vermont and Connecticut have done. Whatever path the Legislature takes, our starting point must be to presume the constitutionality of legislation. *Caviglia, supra,* 178 *N.J.* at 477, 842 *A.*2d 125 ("A legislative enactment is presumed to be constitutional and the burden is on those challenging the legislation to show that it lacks a rational basis."). We will give, as we must, deference to any legislative enactment unless it is unmistakably shown to run afoul of the Constitution. *Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 285, 716 *A.*2d 1137 (1998) (stating that presumption of statute's validity "can be rebutted only upon a showing that the statute's repugnancy to the Constitution is clear beyond a reasonable doubt" (internal quotation marks omitted)), *cert. denied,* 527 *U.S.* 1021, 119 *S.Ct.* 2365, 144 *L.Ed.*2d 770 (1999). Because this State has no experience with a civil union construct that provides equal rights and benefits to same-sex couples, we will not speculate that identical schemes called by different names would create a distinction that would offend Article I, Paragraph 1. We will not presume that a difference in name alone is of constitutional magnitude.

 "A legislature must have substantial latitude to establish classifications," and therefore determining "what is 'different' and what is 'the same' " ordinarily is a matter of legislative discretion. *Plyler v. Doe,* 457 *U.S.* 202, 216, 102 *S.Ct.* 2382, 2394, 72 *L.Ed.*2d 786, 798–99 (1982); *see also Greenberg, supra,* 99 *N.J.* at 577, 494 *A.*2d 294 ("Proper classification for equal protection purposes is not a precise science.... As long as the classifications do not discriminate arbitrarily between persons who are similarly situated, the matter is one of legislative prerogative.").[25] If the Legisla-

---

[25] We note that what we have done and whatever the Legislature may do will not alter federal law, which only confers marriage rights and privileges to

ture creates a separate statutory structure for same-sex couples by a name other than marriage, it probably will state its purpose and reasons for enacting such legislation. To be clear, it is not our role to suggest whether the Legislature should either amend the marriage statutes to include same-sex couples or enact a civil union scheme. Our role here is limited to constitutional adjudication, and therefore we must steer clear of the swift and treacherous currents of social policy when we have no constitutional compass with which to navigate.

Despite the extraordinary remedy crafted in this opinion extending equal rights to same-sex couples, our dissenting colleagues are willing to part ways from traditional principles of judicial restraint to reach a constitutional issue that is not before us. Before the Legislature has been given the opportunity to act, the dissenters are willing to substitute their judicial definition of marriage for the statutory definition, for the definition that has reigned for centuries, for the definition that is accepted in forty-nine states and in the vast majority of countries in the world. Although we do not know whether the Legislature will choose the option of a civil union statute, the dissenters presume in advance that our legislators cannot give any reason to justify retaining the definition of marriage solely for opposite-sex couples. A proper respect for a coordinate branch of government counsels that we defer until it has spoken. Unlike our colleagues who are prepared immediately to overthrow the long established definition of marriage, we believe that our democratically elected representatives should be given a chance to address the issue under the constitutional mandate set forth in this opinion.

We cannot escape the reality that the shared societal meaning of marriage—passed down through the common law into our statutory law—has always been the union of a man and a woman.

---

opposite-sex married couples. *See* 1 *U.S.C.A.* § 7 (defining marriage, under Federal Defense of Marriage Act, as "legal union between one man and one woman").

To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin. When such change is not compelled by a constitutional imperative, it must come about through civil dialogue and reasoned discourse, and the considered judgment of the people in whom we place ultimate trust in our republican form of government. Whether an issue with such far-reaching social implications as how to define marriage falls within the judicial or the democratic realm, to many, is debatable. Some may think that this Court should settle the matter, insulating it from public discussion and the political process. Nevertheless, a court must discern not only the limits of its own authority, but also when to exercise forbearance, recognizing that the legitimacy of its decisions rests on reason, not power. We will not short-circuit the democratic process from running its course.

New language is developing to describe new social and familial relationships, and in time will find its place in our common vocabulary. Through a better understanding of those new relationships and acceptance forged in the democratic process, rather than by judicial fiat, the proper labels will take hold. However the Legislature may act, same-sex couples will be free to call their relationships by the name they choose and to sanctify their relationships in religious ceremonies in houses of worship. *See Bacharach, supra,* 344 *N.J.Super.* at 135, 780 *A.2d* 579 (noting that state laws and policies are not offended if same-sex couples choose to "exchange rings, proclaim devotion in a public or private ceremony, [or] call their relationship a marriage"); Lynn D. Wardle, *Is Marriage Obsolete?,* 10 *Mich. J. Gender & L.* 189, 191–92 ("What is deemed a 'marriage' for purposes of law may not be exactly the same as what is deemed marriage for other purposes and in other settings [such as] religious doctrines. . . .").

The institution of marriage reflects society's changing social mores and values. In the last two centuries, that institution has undergone a great transformation, much of it through legislative

action. The Legislature broke the grip of the dead hand of the past and repealed the common law decisions that denied a married woman a legal identity separate from that of her husband.[26] Through the passage of statutory laws, the Legislature gave women the freedom to own property, to contract, to incur debt, and to sue.[27] The Legislature has played a major role, along with the courts, in ushering marriage into the modern era. *See, e.g.,* Reva B. Siegel, Symposium, *The Modernization of Marital Status Law: Adjudicating Wives' Rights to Earnings 1860–1930,* 82 Geo. *L.J.* 2127, 2148–49 (1994) (discussing courts' role in reformulation of married women's rights).

Our decision today significantly advances the civil rights of gays and lesbians. We have decided that our State Constitution guarantees that every statutory right and benefit conferred to heterosexual couples through civil marriage must be made available to committed same-sex couples. Now the Legislature must determine whether to alter the long accepted definition of marriage. The great engine for social change in this country has always been the democratic process. Although courts can ensure equal treatment, they cannot guarantee social acceptance, which must come through the evolving ethos of a maturing society. Plaintiffs' quest does not end here. Their next appeal must be to their fellow citizens whose voices are heard through their popularly elected representatives.

---

[26] *See Newman v. Chase,* 70 *N.J.* 254, 260 n. 4, 359 A.2d 474 (1976) (noting that prior to Married Women's Property Act of 1852 "the then prevailing rule" entitled husband "to the possession and enjoyment of his wife's real estate during their joint lives"); Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 12 (2000) (explaining that marriage resulted in husband becoming "the one *full* citizen in the household"); Hendrick Hartog, *Man and Wife in America: A History* 99 (2000) (stating that "merger" of wife's identity led to wife's loss of control over property and over her contractual capacity).

[27] *See, e.g., L.* 1906, *c.* 248 (May 17, 1906) (affording married women right to sue); *L.* 1852, *c.* 171 (Mar. 25, 1852) (providing married women property rights).

## VI.

To comply with the equal protection guarantee of Article I, Paragraph 1 of the New Jersey Constitution, the State must provide to committed same-sex couples, on equal terms, the full rights and benefits enjoyed by heterosexual married couples. The State can fulfill that constitutional requirement in one of two ways. It can either amend the marriage statutes to include same-sex couples or enact a parallel statutory structure by another name, in which same-sex couples would not only enjoy the rights and benefits, but also bear the burdens and obligations of civil marriage. If the State proceeds with a parallel scheme, it cannot make entry into a same-sex civil union any more difficult than it is for heterosexual couples to enter the state of marriage.[28] It may, however, regulate that scheme similarly to marriage and, for instance, restrict civil unions based on age and consanguinity and prohibit polygamous relationships.

The constitutional relief that we give to plaintiffs cannot be effectuated immediately or by this Court alone. The implementation of this constitutional mandate will require the cooperation of the Legislature. To bring the State into compliance with Article I, Paragraph 1 so that plaintiffs can exercise their full constitutional rights, the Legislature must either amend the marriage statutes or enact an appropriate statutory structure within 180 days of the date of this decision.

For the reasons explained, we affirm in part and modify in part the judgment of the Appellate Division.

---

[28] We note, for example, that the Domestic Partnership Act requires, as a condition to the establishment of a domestic partnership, that the partners have "a common residence" and be "otherwise jointly responsible for each other's common welfare." *N.J.S.A.* 26:8A–4(b)(1). Such a condition is not placed on heterosexual couples who marry and thus could not be imposed on same-sex couples who enter into a civil union.

Chief Justice PORITZ, concurring and dissenting.

I concur with the determination of the majority that "denying rights and benefits to committed same-sex couples that are statutorily given to their heterosexual counterparts violates the equal protection guarantee of Article I, Paragraph 1[,]" of the New Jersey Constitution.[1] *Ante* at 423, 908 *A.2d* at 200. I can find no principled basis, however, on which to distinguish those rights and benefits from the right to the title of marriage, and therefore dissent from the majority's opinion insofar as it declines to recognize that right among all of the other rights and benefits that will be available to same-sex couples in the future.

I dissent also from the majority's conclusion that there is no fundamental due process right to same-sex marriage "encompassed within the concept of liberty guaranteed by Article I, Paragraph 1." *Ante* at 422–23, 908 *A.2d* at 200. The majority acknowledges, as it must, that there is a universally accepted fundamental right to marriage "deeply rooted in the traditions, history, and conscience of the people." *Ante* at 423, 908 *A.2d* at 200. Yet, by asking whether there is a right to *same-sex* marriage, the Court avoids the more difficult questions of personal dignity and autonomy raised by this case. Under the majority opinion, it appears that persons who exercise their individual liberty interest to choose same-sex partners can be denied the fundamental right to participate in a state-sanctioned civil marriage. I would hold that plaintiffs' due process rights are violated when the State so burdens their liberty interests.

---

[1] Article I, Paragraph 1, states:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[*N.J. Const.* art. I, ¶ 1.]

This language constitutes our State equivalent of the Due Process and Equal Protection Clauses of the Federal Constitution.

## I.

The majority has provided the procedural and factual context for the issues the Court decides today. I will not repeat that information except as it is directly relevant to the analytical framework that supports this dissent. In that vein, then, some initial observations are appropriate.

Plaintiffs have not sought relief in the form provided by the Court—they have asked, simply, to be married. To be sure, they have claimed the specific rights and benefits that are available to all married couples, and in support of their claim, they have explained in some detail how the withholding of those benefits has measurably affected them and their children. As the majority points out, same-sex couples have been forced to cross-adopt their partners' children, have paid higher health insurance premiums than those paid by heterosexual married couples, and have been denied family leave-time even though, like heterosexual couples, they have children who need care. *Ante* at 426, 908 *A.2d* at 202. Further, those burdens represent only a few of the many imposed on same-sex couples because of their status, because they are unable to be civilly married. The majority addresses those specific concerns in its opinion.

But there is another dimension to the relief plaintiffs' seek. In their presentation to the Court, they speak of the deep and symbolic significance to them of the institution of marriage. They ask to participate, not simply in the tangible benefits that civil marriage provides—although certainly those benefits are of enormous importance—but in the intangible benefits that flow from being civilly married. Chief Justice Marshall, writing for the Massachusetts Supreme Judicial Court, has conveyed some sense of what that means:

> Marriage also bestows enormous private and social advantages on those who choose to marry. Civil marriage is at once a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family. "It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold v. Connecticut,* 381 *U.S.* 479, 486, 85

*S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965). Because it fulfils yearnings for security, safe haven, and connection that express our common humanity, civil marriage is an esteemed institution, and the decision whether and whom to marry is among life's momentous acts of self-definition.

[*Goodridge v. Dep't. of Pub. Health*, 440 *Mass.* 309, 798 *N.E.*2d 941, 954–55 (2003).]

Plaintiffs are no less eloquent. They have presented their sense of the meaning of marriage in affidavits submitted to the Court:

In our relationship, Saundra and I have the same level of love and commitment as our married friends. But being able to proudly say that we are married is important to us. Marriage is the ultimate expression of love, commitment, and honor that you can give to another human being.

\* \* \* \*

Alicia and I live our life together as if it were a marriage. I am proud that Alicia and I have the courage and the values to take on the responsibility to love and cherish and provide for each other. When I am asked about my relationship, I want my words to match my life, so I want to say I am married and know that my relationship with Alicia is immediately understood, and after that nothing more needs be explained.

\* \* \* \*

I've seen that there is a significant respect that comes with the declaration "[w]e're married." Society endows the institution of marriage with not only a host of rights and responsibilities, but with a significant respect for the relationship of the married couple. When you say that you are married, others know immediately that you have taken steps to create something special.... The word "married" gives you automatic membership in a vast club of people whose values are clarified by their choice of marriage. With a marriage, everyone can instantly relate to you and your relationship. They don't have to wonder what kind of relationship it is or how to refer to it or how much to respect it.

\* \* \* \*

My parents long to talk about their three married children, all with spouses, because they are proud and happy that we are all in committed relationships. They want to be able to use the common language of marriage to describe each of their children's lives. Instead they have to use a different language, which discounts and cheapens their family as well as mine[, because I have a same-sex partner and cannot be married].

By those individual and personal statements, plaintiffs express a deep yearning for inclusion, for participation, for the right to marry in the deepest sense of that word. When we say that the Legislature cannot deny the tangible benefits of marriage to same-

sex couples, but then suggest that "a separate statutory scheme, which uses a title other than marriage," is presumptively constitutional, *ante* at 423, 908 A.2d at 200, we demean plaintiffs' claim. What we "name" things matters, language matters.

In her book *Making all the Difference: Inclusion, Exclusion, and American Law,* Martha Minnow discusses "labels" and the way they are used:

Human beings use labels to describe and sort their perceptions of the world. The particular labels often chosen in American culture can carry social and moral consequences while burying the choices and responsibility for those consequences.

. . . .

Language and labels play a special role in the perpetuation of prejudice about differences.

[Martha Minnow, *Making all the Difference: Inclusion, Exclusion, and American Law* 4, 6 (1990).]

We must not underestimate the power of language. Labels set people apart as surely as physical separation on a bus or in school facilities. Labels are used to perpetuate prejudice about differences that, in this case, are embedded in the law. By excluding same-sex couples from civil marriage, the State declares that it is legitimate to differentiate between their commitments and the commitments of heterosexual couples. Ultimately, the message is that what same-sex couples have is not as important or as significant as "real" marriage, that such lesser relationships cannot have the name of marriage.[2]

## II.

### A.

Beginning with *Robinson v. Cahill,* this Court has repeatedly rejected a "mechanical" framework for due process and equal

---

[2] Professor Michael Wald, in *Same–Sex Couple Marriage: A Family Policy Perspective* similarly states that "if a State passed a civil union statute for same-sex couples that paralleled marriage, it would be sending a message that these unions were in some way second class units unworthy of the term 'marriage'[,] ... that these are less important family relationships." 9 *Va. J. Soc. Pol'y. & L.* 291, 338 (2001).

protection analyses under Article I, Paragraph 1 of our State Constitution. 62 *N.J.* 473, 491–92, 303 *A.2d* 273 (1973). *See Right to Choose v. Byrne*, 91 *N.J.* 287, 308–09, 450 *A.2d* 925 (1982); *Greenberg v. Kimmelman*, 99 *N.J.* 552, 567–68, 494 *A.2d* 294 (1985); *Planned Parenthood v. Farmer*, 165 *N.J.* 609, 629–30, 762 *A.2d* 620 (2000); *Sojourner A. v. N.J. Dept. of Human Serv.*, 177 *N.J.* 318, 332–33, 828 *A.2d* 306 (2003). Chief Justice Weintraub described the process by which the courts should conduct an Article I review:

> [A] court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.
>
> [*Robinson, supra*, 62 *N.J.* at 492, 303 *A.2d* 273 (citation omitted).]

Later, the Court "reaffirmed that approach [because] it provided a ... flexible analytical framework for the evaluation of equal protection and due process claims." *Sojourner A., supra*, 177 *N.J.* at 333, 828 *A.2d* 306. There, we restated the nature of the weighing process:

> In keeping with Chief Justice Weintraub's direction, we "consider the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." [In so doing] we are able to examine each claim on a continuum that reflects the nature of the burdened right and the importance of the governmental restriction.
>
> [*Ibid.* (quoting *Planned Parenthood, supra*, 165 *N.J.* at 630, 762 *A.2d* 620).]

The majority begins its discussion, as it should, with the first prong of the test, the nature of the affected right. *Ante* at 444, 908 *A.2d* at 212. The inquiry is grounded in substantive due process concerns that include whether the affected right is so basic to the liberty interests found in Article I, Paragraph 1, that it is "fundamental." [3] When we ask the question whether there is

---

[3] Professor Laurence Tribe has described in metaphoric terms, the relationship between due process and equal protection analyses. *Lawrence v. Texas:* The "Fundamental Right" That Dare Not Speak Its Name, 117 *Harv. L.Rev.* 1893, 1897–98. His understanding is especially apt in respect of New Jersey's test. He finds in judges' "conclusions" a "narrative in which due process and equal

a fundamental right to *same-sex* marriage "rooted in the traditions, and collective conscience of our people," *ante* at 434, 908 *A.*2d at 206, we suggest the answer, and it is "no."[4] That is because the liberty interest has been framed "so narrowly as to make inevitable the conclusion that the claimed right could not be fundamental because historically it has been denied to those who now seek to exercise it." *Hernandez v. Robles,* 7 *N.Y.*3d 338, 381, 821 *N.Y.S.*2d 770, 855 *N.E.*2d 1 (2006) (Kaye, C.J., dissenting from majority decision upholding law limiting marriage to heterosexual couples). When we ask, however, whether there is a fundamental right to marriage rooted in the traditions, history and conscience of our people, there is universal agreement that the answer is "yes." *See Loving v. Virginia,* 388 *U.S.* 1, 87 *S.Ct.* 1817, 18 *L.Ed.*2d 1010 (1967); *Turner v. Safley,* 482 *U.S.* 78, 107 *S.Ct.* 2254, 96 *L.Ed.*2d 64 (1987); *Zablocki v. Redhail,* 434 *U.S.* 374, 98 *S.Ct.* 673, 54 *L.Ed.*2d 618 (1978); *see also J.B. v. M.B.,* 170 *N.J.* 9, 23–24, 783 *A.*2d 707 (2001) (noting that right to marry is a fundamental right protected by both federal and state constitutions); *In re Baby M.,* 109 *N.J.* 396, 447, 537 *A.*2d 1227 (1988) (same); *Greenberg v. Kimmelman, supra,* 99 *N.J.* at 571, 494 *A.*2d 294 (same). What same-sex couples seek is admission to that most valuable institution, what they seek is the liberty to choose, as a matter of personal autonomy, to commit to another person, a same-sex person, in a civil marriage. Of course there is no history or tradition including same-sex couples; if there were, there would

---

protection, far from having separate missions and entailing different inquiries, are profoundly interlocked in a legal double helix ... [representing] a single, unfolding tale of equal liberty and increasingly universal dignity." *Ibid.* This case is a paradigm for the interlocking concepts that support both the due process and the equal protection inquiry.

[4] The majority understands that "[h]ow the right is defined may dictate whether it is deemed fundamental." *Ante* at 435, 908 *A.*2d at 207. By claiming that the broad right to marriage is "undifferentiated" and "abstract," and by focusing on the narrow question of the right to same-sex marriage, the Court thereby removes the right from the traditional concept of marriage. *Ante* at 435–36, 908 *A.*2d at 207–08.

have been no need to bring this case to the courts. As Judge Collester points out in his dissent below, "[t]he argument is circular: plaintiffs cannot marry because by definition they cannot marry." *Lewis v. Harris*, 378 *N.J.Super.* 168, 204, 875 *A.*2d 259 (App.Div.2005) (Collester, J., dissenting); *see Hernandez, supra*, 7 *N.Y.*3d at 385, 821 *N.Y.S.*2d 770, 855 *N.E.*2d 1 (Kaye, C.J., dissenting) ("It is no answer that same-sex couples can be excluded from marriage because 'marriage,' by definition, does not include them. In the end, 'an argument that marriage is heterosexual because it 'just is' amounts to circular reasoning.' " (quoting *Halpern v. Attorney Gen. of Can.*, 65 *O.R.*3d 161, 181 (2003))).

I also agree with Judge Collester that *Loving* should have put to rest the notion that fundamental rights can be found only in the historical traditions and conscience of the people. *See Lewis, supra*, 378 *N.J.Super.* at 205, 875 *A.*2d 259. Had the United States Supreme Court followed the traditions of the people of Virginia, the Court would have sustained the law that barred marriage between members of racial minorities and caucasians. The Court nevertheless found that the Lovings, an interracial couple, could not be deprived of "the freedom to marry [that] has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving, supra*, 388 *U.S.* at 12, 87 *S.Ct.* at 1824, 18 *L.Ed.*2d at 1018. Most telling, the Court did not frame the issue as a right to interracial marriage but, simply, as a right to marry sought by individuals who had traditionally been denied that right. *Loving* teaches that the fundamental right to marry no more can be limited to same-race couples than it can be limited to those who choose a committed relationship with persons of the opposite sex. By imposing that limitation on same-sex couples, the majority denies them access to one of our most cherished institutions simply because they are homosexuals.

*Lawrence v. Texas*, 539 *U.S.* 558, 123 *S.Ct.* 2472, 156 *L.Ed.*2d 508 (2003), in overruling *Bowers v. Hardwick*, 478 *U.S.* 186, 106 *S.Ct.* 2841, 92 *L.Ed.*2d 140 (1986), made a different but equally powerful point. In *Bowers*, the Court had sustained a Georgia statute that made sodomy a crime. 478 *U.S.* at 189, 106 *S.Ct.* at

2843, 92 *L.Ed.*2d at 145. When it rejected the *Bowers* holding seventeen years later, the Court stated bluntly that *"Bowers* was not correct when it was decided, and it is not correct today." *Lawrence, supra,* 539 *U.S.* at 578, 123 *S.Ct.* at 2484, 156 *L.Ed.*2d at 525. Justice Kennedy explained further that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Id.* at 579, 123 *S.Ct.* at 2484, 156 *L.Ed.*2d at 526.

We are told that when the Justices who decided *Brown v. Board of Education,* 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873 (1954), finally rejected legal segregation in public schools, they were deeply conflicted over the issue. Michael J. Klarman, *Brown and Lawrence (and Goodridge),* 104 *Mich. L.Rev.* 431, 433 (2005). "The sources of constitutional interpretation to which they ordinarily looked for guidance—text, original understanding, precedent, and custom—indicated that school segregation was permissible. By contrast, most of the Justices privately condemned segregation, which Justice Hugo Black called 'Hitler's creed.' Their quandary was how to reconcile their legal and moral views." *Ibid.* (footnote omitted). Today, it is difficult to believe that *"Brown* was a hard case for the Justices." *Ibid.*

Without analysis, our Court turns to history and tradition and finds that marriage has never been available to same-sex couples. That may be so—but the Court has not asked whether the limitation in our marriage laws, "once thought necessary and proper in fact serve[s] only to oppress." I would hold that plaintiffs have a liberty interest in civil marriage that cannot be withheld by the State. Framed differently, the right that is burdened under the first prong of the Court's equal protection/due process test is a right of constitutional dimension.

### B.

Although the majority rejects the argument I find compelling, it does grant a form of relief to plaintiffs on equal protection

grounds, finding a source for plaintiffs' interest outside of the Constitution. *Ante* at 448, 458–59, 908 *A.*2d at 221. Having previously separated the right to the tangible "benefits and privileges" of marriage from the right to the "name of marriage," and having dismissed the right to the name of marriage for same-sex couples because it is not part of our history or traditions, the majority finds the right to the tangible benefits of marriage in enactments and decisions of the legislative, executive, and judicial branches protecting gays and lesbians from discrimination, allowing adoption by same-sex partners, and conferring some of the benefits of marriage on domestic partners. *Ante* at 438–439, 444–48, 452, 908 *A.*2d at 208, 212–15, 217.

The enactments and decisions relied on by the majority as a source of same-sex couples' interest in equality of treatment are belied by the very law at issue in this case that confines the right to marry to heterosexual couples. Moreover, as the majority painstakingly demonstrates, the Domestic Partnership Act, *N.J.S.A.* 26:8A–1 to –13, does not provide many of the tangible benefits that accrue automatically when heterosexual couples marry. *Ante* at 448–51, 908 *A.*2d at 215–17. New Jersey's statutes reflect both abhorrence of sexual orientation discrimination and a desire to prevent same-sex couples from having access to one of society's most cherished institutions, the institution of marriage. Plaintiffs' interests arise out of constitutional principles that are integral to the liberty of a free people and not out of the legislative provisions described by the majority. In any case, it is clear that civil marriage and all of the benefits it represents is absolutely denied same-sex couples, and, therefore, that same-sex couples' fundamental rights are not simply burdened but are denied altogether (the second prong of the Court's test).

Finally, the majority turns to the third prong—whether there is a public need to deprive same-sex couples of the tangible benefits and privileges available to heterosexual couples. *Ante* at 451, 908 *A.*2d at 217. Because the State has argued only that historically

marriage has been limited to opposite-sex couples, and because the majority has accepted the State's position and declined to find that same-sex couples have a liberty interest in the choice to marry, the majority is able to conclude that *no* interest has been advanced by the State to support denying the rights and benefits of marriage to same-sex couples. *Ante* at 451–53, 908 *A.*2d at 217–18. Without any state interest to justify the denial of tangible benefits, the Court finds that the Legislature must provide those benefits to same-sex couples. *Ibid.* I certainly agree with that conclusion but would take a different route to get there.

Although the State has not made the argument, I note that the Appellate Division, and various *amici curiae,* have claimed the "promotion of procreation and creating the optimal environment for raising children as justifications for the limitation of marriage to members of the opposite sex." *Lewis, supra,* 378 *N.J.Super.* at 185 n. 2, 875 *A.*2d 259. That claim retains little viability today. Recent social science studies inform us that "same-sex couples increasingly form the core of families in which children are conceived, born, and raised." Gregory N. Herek, *Legal Recognition of Same–Sex Relationships in the United States: A Social Science Perspective,* 61 *Am. Psychol.* 607, 611 (2006). It is not surprising, given that data, that the State does not advance a "promotion of procreation" position to support limiting marriage to heterosexuals. Further, "[e]mpirical studies comparing children raised by sexual minority parents with those raised by otherwise comparable heterosexual parents have not found reliable disparities in mental health or social adjustment," *id.* at 613, suggesting that the "optimal environment" position is equally weak. Without such arguments, the State is left with the "but that is the way it has always been" circular reasoning discussed *supra* at 469–70, 908 *A.*2d at 227–28.

## C.

Perhaps the political branches will right the wrong presented in this case by amending the marriage statutes to recognize fully the

fundamental right of same-sex couples to marry. That possibility does not relieve this Court of its responsibility to decide constitutional questions, no matter how difficult. Deference to the Legislature is a cardinal principle of our law except in those cases requiring the Court to claim for the people the values found in our Constitution. Alexander Hamilton, in his essay, *Judges as Guardians of the Constitution, The Federalist No. 78*, (Benjamin Fletcher Wright ed., 1961) spoke of the role of the courts and of judicial independence. He argued that "the courts of justice are . . . the bulwarks of a limited Constitution against legislative encroachments" because he believed that the judicial branch was the only branch capable of opposing "oppressions [by the elected branches] of the minor party in the community." *Id.* at 494. Our role is to stand as a bulwark of a constitution that limits the power of government to oppress minorities.

The question of access to civil marriage by same-sex couples "is not a matter of social policy but of constitutional interpretation." *Opinions of the Justices to the Senate*, 440 *Mass.* 1201, 802 *N.E.*2d 565, 569 (2004). It is a question for this Court to decide.

## III.

In his essay *Three Questions for America*, Professor Ronald Dworkin talks about the alternative of recognizing "a special 'civil union' status" that is not "marriage but nevertheless provides many of the legal and material benefits of marriage." *N.Y. Rev. Books*, Sept. 21, 2006 at 24, 30. He explains:

Such a step reduces the discrimination, but falls far short of eliminating it. The institution of marriage is unique: it is a distinct mode of association and commitment with long traditions of historical, social, and personal meaning. It means something slightly different to each couple, no doubt. For some it is primarily a union that sanctifies sex, for others a social status, for still others a confirmation of the most profound possible commitment. But each of these meanings depends on associations that have been attached to the institution by centuries of experience. We can no more now create an alternate mode of commitment carrying a parallel intensity of meaning than we can now create a substitute for poetry or for love. The status of marriage is therefore a social resource of irreplaceable value to those to whom it is offered: it enables two people together to create value in their lives that they could not create if that institution had never existed. We know that

people of the same sex often love one another with the same passion as people of different sexes do and that they want as much as heterosexuals to have the benefits and experience of the married state. If we allow a heterosexual couple access to that wonderful resource but deny it to a homosexual couple, we make it possible for one pair but not the other to realize what they both believe to be an important value in their lives.

[*Ibid.*]

On this day, the majority parses plaintiffs' rights to hold that plaintiffs must have access to the tangible benefits of state-sanctioned heterosexual marriage. I would extend the Court's mandate to require that same-sex couples have access to the "status" of marriage and all that the status of marriage entails.

Justices LONG and ZAZZALI join in this opinion.

*For affirmance in part/modification in part*—Justices LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—4.

*For concurring in part/dissenting in part*—Chief Justice PORITZ and Justices LONG and ZAZZALI—3.