115 A.3d 292

AMERICAN HUMANIST ASSOCIATION AND JOHN AND JANE DOE, INDIVIDUALLY AND AS PARENTS AND NEXT FRIENDS OF DOE CHILD, PLAINTIFFS, v. MATAWAN–ABERDEEN REGIONAL SCHOOL DISTRICT AND DAVID M. HEALY, IN HIS CAPACITY AS SUPERINTENDENT OF SCHOOLS, DEFENDANTS, AND THE AMERICAN LEGION, THE AMERICAN LEGION DEPARTMENT OF NEW JERSEY, THE AMERICAN LEGION MATAWAN POST 176, FRANK JONES, MICHELE JONES, S. JONES, F. JONES, H. JONES, AND THE KNIGHTS OF COLUMBUS, DEFENDANTS–INTERVENORS.

Superior Court of New Jersey
Law Division Monmouth County

Decided February 4, 2015.

584

---

*Arnold N. Fishman* (*Law Offices of Fishman & Fishman, L.L.C.,* attorneys), *David A. Niose* (*Law Offices of David Noise*) of the Massachusetts bar, admitted pro hac vice, and *Monica Lynn*

*Miller* (*American Humanist Association*) of the California and District of Columbia bars, admitted pro hac vice, for plaintiffs.

*David B. Rubin* (*David B. Rubin, P.C.,* attorneys) and *Rita F. Barone,* (*Purcell, Mulcahy, O'Neill & Hawkins,* attorneys), for defendants.

*James A. Paone, II* (*Lomurro, Davison, Eastman & Munoz, P.A.,* attorneys), *Eric C. Rassbach* of the California bar, admitted pro hac vice, and *Diana M. Verm* of the District of Columbia and Virginia bars, admitted pro hac vice (*The Becket Fund for Religious Liberty,* attorneys), for defendants-intervenors Frank Jones, Michele Jones, S. Jones, F. Jones, H. Jones and the Knights of Columbus.

*Glen A. Sproviero* (*Fishkin Lucks, L.L.P.,* attorneys), *Gerald J. Russello* and *Christopher R. Mills* of the New York bar, admitted pro hac vice (*Sidley Austin, LLP,* attorneys), *Jeff Mateer* of the Texas bar, and *Roger Byron* of the Texas and Kentucky bars, admitted pro hac vice (*Liberty Institute*) for defendants-intervenors, The American Legion, The American Legion Department of New Jersey, and The American Legion Matawan Post 176.

BAUMAN, P.J. Cv.

The preamble to the New Jersey Constitution provides: "We, the people of the State of New Jersey, grateful to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy, and looking to Him for a blessing upon our endeavors to secure and transmit the same unimpaired to succeeding generations, do ordain and establish this Constitution." Plaintiffs John Doe and Jane Doe ("Does"), individually and as parents of Doe child, are avowed atheists who, joined by plaintiff American Humanist Association ("AHA"), filed a complaint alleging that defendants Matawan–Aberdeen Regional School District ("school district") and its Superintendent of Schools, David M. Healy[1] vio-

---

[1] Healy was dismissed from this action, without prejudice, by stipulation of the parties.

lated the Does' equal protection rights under the New Jersey Constitution by following the mandates of a state statute "requir[ing] the pupils in each school in the district on every school day to salute the United States flag and repeat the . . . pledge of allegiance to the flag. . . ." *N.J.S.A.* 18A:36–3.[2] The school district has moved to dismiss the complaint for failure to state a claim on which relief can be granted. The court, for the reasons that follow, grants the motion.

## I. Background

The Does are atheists and humanists who "do not accept the existence of any type of God or gods." The Does are the parents of Doe child[3] who attends a public school in the school district, where the pledge of allegiance ("pledge") is recited by children every school day. Plaintiffs maintain that Doe child's humanist beliefs do not allow him to participate fully in the pledge and that Doe child feels excluded from the other children when the pledge is recited. Moreover, plaintiffs argue that by including the language "under God" in the pledge, New Jersey is defining patriotism in terms of God-belief and is ignoring the non-theistic beliefs of atheists.

---

[2] *N.J.S.A.* 18A:36–3 provides:

Every board of education shall:

\* \* \*

Require the pupils in each school in the district on every school day to salute the United States flag and repeat the following pledge of allegiance to the flag: "I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all," which salute and pledge of allegiance shall be rendered with the right hand over the heart, except that pupils who have conscientious scruples against such pledge or salute, or are children of accredited representatives of foreign governments to whom the United States government extends diplomatic immunity, shall not be required to render such salute and pledge but shall be required to show full respect to the flag while the pledge is being given merely by standing at attention, the boys removing the headdress.

[3] The court granted the Does' motion for pseudonymity.

The Does are members of the AHA and other national and local humanist and atheist organizations. AHA espouses humanism, which "encompasses a variety of nontheistic views (atheism, agnosticism, rationalism, naturalism, secularism) while adding the important element of a comprehensive worldview and set of ethical values—values that are grounded in the philosophy of the Enlightenment, informed by scientific knowledge, and driven by a desire to meet the needs of people in the here and now." AHA joins the Doe family in challenging New Jersey's pledge statute because the organization is devoted to "promot[ing] Humanism and defend[ing] the rights of Humanists and other non-theistic individuals." The American Legion, the American Legion Department of New Jersey, the American Legion Matawan Post 176, the Jones family, and the Knights of Columbus have been granted leave to intervene in this action.

The United States Congress officially adopted the pledge of allegiance in 1942 during World War II, "confirm[ing] the importance of the flag as a symbol of our nation's indivisibility and commitment to the concept of liberty." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 *U.S.* 1, 6–7, 124 *S.Ct.* 2301, 2305, 159 *L.Ed.*2d 98, 105–06 (2004). At that time, the text of the pledge provided "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all." *Ibid.* Congress amended the text in 1954, during the Cold War, to include the language "under God." *Ibid.* The House Report on that amendment reflects Congress's intent to underscore that political authority comes from God. The Report states:

> From the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God.... Since our flag is symbolic of our Nation, its constitutional government and the morality of our people, the committee believes it most appropriate that the concept of God be included in the recitations of the pledge of allegiance to the flag.
>
> [*H.R. Rep. No.* 83–1693, at 1–2 (1954).]

However, the House Report makes clear that the addition of the language "under God" was not meant to interfere with religious

freedom: " 'A distinction must be made between the existence of a religion as an institution and a belief in the sovereignty of God. The phrase 'under God' recognizes only the guidance of God in our national affairs.' " *Id.* at 3. President Eisenhower officially endorsed the amendment and Congress's reasoning, stating:

> From this day forward, the millions of our school children will daily proclaim in every city and town, every village and rural schoolhouse, the dedication of our Nation and our people to the Almighty.... In this way we are reaffirming the transcendence of religious faith in America's heritage and future; in this way we shall constantly strengthen those spiritual weapons which forever will be our country's most powerful resource, in peace or in war.
>
> [100 *Cong. Rec.* S8617–18 (1954).]

This version of the pledge has been recited by school children for decades and is the version at issue in the present lawsuit.

## II. Legal Standard

Although the motion before the court was filed as a motion to dismiss for failure to a state a claim, pursuant to *Rule* 4:6-2(e), the court will convert the motion to one for summary judgment. For a court to determine that a case should be dismissed for failure to state a claim under *Rule* 4:6–2(e), the inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint. *Rieder v. Dep't of Transp.,* 221 *N.J.Super.* 547, 552, 535 *A.*2d 512 (App.Div.1987). However, the *Rule* provides for an exceptional circumstance when "matters outside the pleading are presented to and not excluded by the court." *R.* 4:6–2. In those cases, "the motion shall be treated as one for summary judgment and disposed of as provided by *R.* 4:46." *Ibid.* Attached to the motion papers were documents containing information outside of the pleadings, including the school district's policy on the pledge, a list of the daily invocations at the 1947 State Constitutional Convention, and various emails collected by the AHA, authored by allegedly atheist students. By operation of *Rule* 4:6–2, the court will convert this motion to a summary judgment motion.

Summary judgment is " 'designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions

and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at trial.'" *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 530, 666 *A.*2d 146 (1995) (quoting *Ledley v. William Penn Life Ins. Co.*, 138 *N.J.* 627, 641–42, 651 *A.*2d 92 (1995)). When evaluating a motion for summary judgment "the motion judge [must] ... consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Id.* at 540, 666 *A.*2d 146. The essence of the inquiry by the trial judge should be the same as is applied in motions for directed verdicts: "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 536, 666 *A.*2d 146 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)). When the issue is so one-sided that one party must prevail as a matter of law, the court should not hesitate to grant summary judgment. *Ibid.* "The thrust of [*Brill*] is to encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves." *Id.* at 541, 666 *A.*2d 146. Such circumstances are present here.

III. Discussion

*The Monell Standard, the New Jersey Civil Rights Act, and Direct Challenges to the New Jersey Constitution*

Preliminarily, the school district urges that the complaint be dismissed against it because the United States Supreme Court decision in *Monell v. Department of Social Services*, 436 *U.S.* 658, 98 *S.Ct.* 2018, 56 *L.Ed.*2d 611 (1978), precludes plaintiffs' cause of action. In *Monell*, the Supreme Court considered the parameters of the constitutional enforcement statute, 42 *U.S.C.A* § 1983, when applied to local government officials. *Id.* at 662, 98 *S.Ct.* at 2021, 56 *L.Ed.*2d at 618. Specifically at issue was whether plaintiffs, a

class of female employees, could bring a § 1983 claim for back pay against the New York City Department of Social Services for an unconstitutional policy regarding pregnancy leave. *Ibid.* The Court held that

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

[*Id.* at 694, 98 *S.Ct.* at 2037–38, 56 *L.Ed.*2d at 638.]

Although there is an official policy at issue here,[4] the school district maintains that it is merely following New Jersey's pledge statute and, therefore, cannot be liable for any constitutional violation. Although neither the Supreme Court nor the Third Circuit has ruled on *Monell's* application to a municipal entity applying state law, this court need not decide that issue here because plaintiffs are not asserting a claim under the United States Constitution and, therefore, § 1983 is not implicated. Nor are they bringing a claim pursuant to the New Jersey equivalent to § 1983, the New Jersey Civil Rights Act, and thus they are not triggering *Monell's* jurisprudence. *See Ingram v. Twp. of Deptford,* 911 *F.Supp.*2d 289, 298 (D.N.J.2012) (explaining that New Jersey courts look to jurisprudence on § 1983 for guidance in interpreting the New Jersey Civil Rights Act). Instead, plaintiffs are bringing their claim directly under the New Jersey Constitution. The New Jersey Supreme Court has held that the "Court has the power to enforce rights recognized by the New Jersey Constitution, even in the absence of implementing legislation." *Peper v. Princeton Univ. Bd. of Trs.,* 77 *N.J.* 55, 77, 389 *A.*2d 465 (1978). In light of *Peper,* plaintiffs, who allege that their equal protection rights recognized under the New Jersey Constitution were violated, may bring their claims directly against the school district.

---

4 *See infra,* n. 7.

Having decided that plaintiffs lawfully may bring this action against the school district, the court concludes that New Jersey's pledge statute does not violate plaintiffs' equal protection rights under either Article 1, Paragraph 1 or Article 1, Paragraph 5, of the New Jersey Constitution.

*Article 1, Paragraph 1*

Article 1, Paragraph 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." This paragraph has been interpreted by New Jersey courts as guaranteeing equal protection under the law. *See, e.g., Lewis v. Harris,* 188 *N.J.* 415, 443, 908 *A.*2d 196 (2006). "When a statute is challenged on the ground that it does not apply evenhandedly to similarly situated people, our equal protection jurisprudence requires that the legislation, in distinguishing between two classes of people, bear a substantial relationship to a legitimate governmental purpose." *Ibid.* In considering equal protection claims, New Jersey courts apply a balancing test, "weighing three factors: the nature of the right at stake, the extent to which the challenged statutory scheme restricts that right, and the public need for the statutory restriction." *Id.* at 443–44, 908 *A.*2d 196.

Plaintiffs argue that all three *Lewis* factors weigh in their favor: (1) the right at stake is "the right [of children and families] to not be disfavored and discriminated against based on their religion"; (2) the pledge statute "draws a line between . . . God-believers and atheists because atheists necessarily do not believe the Nation is under God" and thereby greatly restricts the rights of atheist students; and (3) there is no public need for that restriction.

As to the first *Lewis* factor, plaintiffs assert that the constitutional right at issue is "vitally important" because it pertains to religious freedom. In no way is religious freedom impli-

cated in the recitation of the pledge of allegiance from either a historical or practical perspective. The founding fathers embraced the then novel concept that a person could worship as he or she pleased without fear of prosecution, or persecution; but that freedom, as Thomas Jefferson wrote in his *Notes on the State of Virginia*, could not "be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are of the gift of God[.]" Thomas Jefferson, *Notes on the State of Virginia* 174 (Lilly and Wait 1832) (1782).

Over and over, from the writings of the founders of the Constitutions of both the United States and the State of New Jersey, emerges a faith in, and a reliance and even dependency upon God to help secure the blessings of liberties and freedom attendant upon good governance. In George Washington's 1783 Circular Address to the newly minted States, for example, Washington "make[s] it [his] earnest prayer, that God would have you, and the State over which you preside, in his [sic] holy protection, that he [sic] would incline the hearts of the Citizens to cultivate a spirit of subordination and obedience to Government." George Washington, *The Writings of George Washington* (John Clement Fitzpatrick, ed., 1944), *available at* http://etext.lib.virginia.edu/washington (last visited May 4, 2015). It was Washington who added the impromptu, extra-constitutional "so help me God" following his dutiful recitation of the text of the presidential oath set forth in Article II. *See Elk Grove, supra,* 542 *U.S.* at 26, 124 *S.Ct.* at 2317, 159 *L.Ed.*2d at 118–19 (Rehnquist, C.J., concurring). Benjamin Franklin, the archetypical embodiment of enlightenment ideals in both Europe and America, beseeched his colleagues at the Constitutional Convention in Philadelphia to move "that henceforth prayers imploring the assistance of Heaven, and its blessings on our deliberations, be held in this Assembly every morning before we proceed to business, and that one or more of the Clergy of this City be requested to officiate in that service." 2 J.A. Spencer, *History of the United States from the Earliest Period to the Administration of President Johnson* 222 (1866). This practice, followed today, is one that the courts of this land have

consistently held does not run afoul of the Establishment Clause, or any other provision, of the federal Constitution. *See, e.g., Town of Greece v. Galloway,* —— *U.S.* ——, ——, 134 *S.Ct.* 1811, 188 *L.Ed.*2d 835 (2014). As observed by the United States Supreme Court, "[t]he fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *School Dist. of Abington Twp. v. Schempp,* 374 *U.S.* 203, 213, 83 *S.Ct.* 1560, 1566, 10 *L.Ed.*2d 844, 853 (1963).

Similarly, the founders of our present 1947 New Jersey Constitution saw fit to preface that document by expressing the gratitude of the people of this state "to Almighty God for the civil and religious liberty which He hath so long permitted us to enjoy," and the hope that God would "bless[ ] . . . our endeavors to secure and transmit the same unimpaired to succeeding generations." *N.J. Const.* pmbl. The preamble to the 1947 Constitution is identical to the preamble to the Constitution of 1844. Robert F. Williams, *The New Jersey State Constitution: A Reference Guide* 26 (1997).

Indeed, the New Jersey Constitution, in various permutations since 1776, has made explicit references to "Almighty God."[5] *Williams, supra,* at 32. Under plaintiffs' reasoning, the very Constitution under which plaintiffs seek redress for perceived atheistic marginalization could itself be deemed unconstitutional, an absurd proposition which plaintiffs do not and cannot advance here.

The pledge of allegiance, in this historical context, is not to be viewed, and has never been viewed, as a religious exercise. It is

---

[5] As noted by Williams, paragraph 3 of Article I of the 1947 Constitution, which begins with "no person shall be deprived of the inestimable privilege of worshipping Almighty God in a manner agreeable to the dictates of his own conscience," is "nearly verbatim from Article XVIII of the 1776 Constitution." *Williams, supra,* at 32. He further notes that this paragraph also "appeared as Article I, section 3, in the 1844 Constitution and was carried over in the 1947 Constitution." *Ibid.*

intended, rather, as a vehicle to transmit, "unimpaired to succeeding generations" of American public school boys and girls, those core values of duty, honor, pride and fidelity to country on which the social contract between the United States and its citizens is ultimately based. To that end, the pledge statute undeniably advances a compelling state interest.

Moreover, the words "under God" are now as interwoven through the fabric of the pledge of allegiance as the threads of red, white, and blue into the fabric of the flag to which the pledge is recited. As a matter of historical tradition, the words "under God" can no more be expunged from the national consciousness than the words "In God We Trust" from every coin in the land, than the words "so help me God" from every presidential oath since 1789, or than the prayer that has opened every congressional session of legislative business since 1787. Regardless, this court finds that the recitation of the pledge of allegiance is a secular, not a religious activity and, thus, a constitutionally-protected activity. No case stands for the contrary. The United States Supreme Court has explained that "[a]s its history illustrates, the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles." *Elk Grove, supra,* 542 *U.S.* at 6, 124 *S.Ct.* at 2305, 159 *L.Ed.*2d at 105–06; *see also Freedom From Religion Found. v. Hanover Sch. Dist.,* 626 *F.*3d 1, 15 (1st Cir.2010) ("[V]oluntary, teacher-led recitation of the Pledge by the state's public school students do not violate the Constitution."); *Newdow v. Rio Linda Sch. Dist.,* 597 *F.*3d 1007, 1014 (9th Cir.2010) ("We hold that the Pledge of Allegiance does not violate the Establishment Clause because Congress' ostensible and predominant purpose was to inspire patriotism and that the context of the Pledge—its wording as a whole, the preamble to the statute, and this nation's history— demonstrate that it is a predominately patriotic exercise."); *Sherman v. Cmty. Consol. Sch. Dist. 21,* 980 *F.*2d 437, 439 (7th Cir.1992) ("We conclude that schools may lead the Pledge of

Allegiance daily, so long as pupils are free not to participate."), *cert. denied,* 508 *U.S.* 950, 113 *S.Ct.* 2439, 124 *L.Ed.*2d 658 (1993).

■ As to the second *Lewis* factor, plaintiffs' argument that New Jersey's pledge statute "draws a line" between public school students suffers from the same infirmities recognized by both the First Circuit and the Supreme Judicial Court of Massachusetts in circumstances virtually identical to those of the instant case; namely, there is no classification under the pledge statute because, on its face, the recitation of the pledge is entirely voluntary. *See Freedom, supra,* 626 *F.*3d at 14; *Doe v. Acton–Boxborough Reg'l Sch. Dist.,* 468 *Mass.* 64, 8 *N.E.*3d 737, 746 (2014). Under the pledge statute, as under the statutes at issue in *Freedom* and *Doe,* any child is free to abstain from the pledge for any reason, whether it be religious, political, moral, or any other principle. Nor does the pledge statute require a conscientious objector to state his or her reasons for refusing to participate. Therefore, on its face, the pledge statute does not distinguish between students and instead " 'applies equally to those who believe in God, those who do not, and those who do not have a belief either way, giving adherents of all persuasions the right to participate or not participate in reciting the pledge, for any or no reason.'" *Freedom, supra,* 626 *F.*3d at 14 (quoting *Freedom From Religion Found. v. Hanover Sch. Dist.,* 665 *F.Supp.*2d 58, 72 (D.N.H.2009)).

Nor does the pledge statute, as applied by the school district, raise a classification issue under the evidence presented here. Critically, plaintiffs do not claim either in the complaint or in any affidavit or certification that the school district is forcing Doe child to recite the words "under God" or that Doe child is being pressured in any way to participate in the flag salute.[6] Indeed,

---

[6] The only affidavit or certification submitted by plaintiffs in connection with this case, from any student who claims he or she was harassed or mistreated for not participating in the pledge recitation, is the affidavit of Chelsea Stanton, who plaintiffs identify as a former student at Collingswood High School in Collingswood, New Jersey, and which plaintiffs submitted to the court in support of their motion for pseudonymity for the Does. The Stanton affidavit states that after

plaintiffs "recognize that Doechild has the right to refuse participation in the flag-salute exercise and Pledge recitation." Moreover, plaintiffs do not allege that Doe child volunteered, or was obligated to provide, any explanation as to why he does not participate in the flag salute, and no evidence was adduced to the contrary.[7] As such, the voluntary nature of the recitation of the

refusing to stand for the pledge of allegiance, Stanton was "the target of extreme harassment and bullying, including physical assault." Stanton's alleged mistreatment took place in Collingswood, and there is no indication that she ever attended public school in the Matawan–Aberdeen School District. The facts presented in the affidavit pertain to Stanton alone, not Doe child.

[7] At oral argument, the court questioned defendant's counsel about a document, affixed to plaintiffs' brief, which purports to be a document adopted as policy by the Matawan–Aberdeen School Board. The document, titled "8820 Ceremonies and Observances," contains a subsection headed "Flag Salute." The text underlying this subsection provides, in pertinent part:

> In accordance with State statute, pupils shall be required to salute the flag and recite the Pledge of Allegiance during each day's opening exercises. When a pupil has conscientious objections which interfere with his/her full participation in the flag salute and Pledge of Allegiance, he/she shall be required to maintain a respectful attitude throughout the ceremony.

> Parent(s) or legal guardian(s) of pupils refusing to salute the flag shall be informed of the refusal by the school administration. The parent(s) or legal guardian(s) of a minor pupil shall be required to furnish the school administration with a written statement of their child's conscientious objection. Pupils eighteen or older shall provide his/her own written statement.

Plaintiffs, in a footnote in their brief, found it "troubling" that "the policy *requires* students who choose to opt out to justify, in writing, the nature of their objection, thus providing a disincentive to refrain from participating." During questioning by the court, defendant's counsel represented that he did not know to whom the written statement was to be submitted, what, if anything, was to be done with it, and what would happen if a parent or student of majority age refused to provide the written statement. Indeed, it appeared that counsel was unaware of the existence of this school board policy, although counsel noted, correctly, that there was no allegation in the complaint challenging the constitutionality of this policy or claiming that it had ever been enforced against Doe child or anyone else.

At the court's direction, further briefing was submitted on the effect, if any, of the policy on the constitutional issue presented in this case. Plaintiffs correctly noted that the complaint specifically alleged that the pledge was recited pursuant to statute "and regular school policy and practice," and that it sought declaratory relief pursuant to statute "or any other governmental

pledge of allegiance in this case is not and cannot be in dispute. And, even if, for the sake of argument, and contrary to the record, plaintiffs were able to establish that the pledge statute classifies students, the court finds that the pledge statute bears a substantial relationship to a legitimate if not compelling governmental interest—that of ensuring that our youth who will one day carry the torch of this republic do not extinguish it by indifference to its cause.

Finally, as to the third *Lewis* factor—the public need for the statutory restriction urged by plaintiffs—the court is not insensitive to the Does and Doe child's claim that they feel marginalized by inclusion of the words "under God" in the text of the pledge. Subjective feelings, however, do not and cannot serve as a constitutional litmus test for equal protection in the absence of some invidious classification, because potentially anything offensive to one's subjective sensibilities could be struck down as unconstitutional. If public schools were constitutionally compelled to eliminate certain curricula simply because its content marginalized or had a tendency to marginalize a student or students, the value of higher education in public schools could sorely be diminished. As Justice Robert F. Jackson explained in his concurring opinion in *Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 *U.S.* 203, 235, 68 *S.Ct.* 461, 477, 92 *L.Ed.* 649, 671 (1948) (Jackson, J. concurring), "If we are to eliminate everything that is objectionable to any [individual] . . . we will leave public education in shreds. Nothing but educational confusion and a

---

policy or practice" that the recitation of the pledge is unconstitutional. However, in their supplemental submissions, defendants informed the court that the Matawan–Aberdeen Regional School Board was revising policy 8820 to delete the aforementioned paragraphs from that policy, thus implicitly acknowledging that the paragraphs were potentially problematic. However, in the absence of any allegation, or evidence, that the Doe child or the Doe child's parents were informed of Doe child's refusal to salute or recite the pledge, or were required to furnish a written statement of Doe child's conscientious objection, and given the board's deletion of those requirements, any issue raised by plaintiffs with respect to board policy 8820 is now moot.

discrediting of the public school system can result from subjecting it to constant law suits." Protecting students from viewpoints and ideas that may offend or upset them is not and has never been the role of public schools in America. As the First Circuit has explained, "[p]ublic schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them." *Parker v. Hurley,* 514 *F.*3d 87, 106 (1st Cir.2008), *cert. denied,* 555 *U.S.* 815, 129 *S.Ct.* 56, 172 *L.Ed.*2d 24 (2008).

Applying the *Lewis* factors to the circumstances presented here compels the conclusion that the school district did not violate plaintiffs' equal protection rights under Article 1, Paragraph 1 of the New Jersey Constitution. Recitation of the pledge of allegiance does not implicate the religious freedom of plaintiffs or anyone else. So long as Doe child is not forced to participate in the pledge or punished or mistreated for not participating—and there is no allegation in the complaint or fact of record suggesting that that has occurred—there is no constitutionally impermissible classification. Expunging the words "under God" from the pledge of allegiance does not and will not serve a public need because the overriding purpose of public education in public schools is to foster, not restrict, ideas without requiring adherence to those ideas. Because the court finds that the *Lewis* factors do not weigh in plaintiffs' favor, there is no equal protection violation under Article 1, Paragraph 1 of the New Jersey Constitution.

*Article 1, Paragraph 5*

Plaintiffs also contend that the statute violates Article 1, Paragraph 5 of the New Jersey Constitution, which states: "No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry, or national origin." However, as explained above, plaintiffs cannot establish any kind

of discrimination because Doe child is not being treated any differently than his peers, nor is he being coerced to partake in an activity that violates his religious beliefs.

Plaintiffs have improperly placed before this court hearsay statements attributed to certain avowed atheist students from around the country, presumably to highlight concerns of atheists throughout the country and the discrimination they allegedly experience because of their non-theistic beliefs.[8]  This court, however, is not the appropriate forum in which to seek redress for those concerns.  The narrow issue before the court is whether the recitation of the pledge of allegiance by public school students in the school district pursuant to *N.J.S.A.* 18A:36–3(c) passes muster under the equal protection provision of the New Jersey Constitution.  The court concludes that it does.  In this limited context, the court declines to consider the propriety of laws in other states that allegedly bar atheists from holding public office or to address plaintiffs' contention that atheists are "the most disliked and distrusted minority group in the country," as alleged in the complaint.

For the foregoing reasons, defendant's motion is granted and plaintiffs' complaint is dismissed.

---

[8] These statements, which AHA's counsel admitted at oral argument were solicited by AHA during the pendency of this motion to bolster plaintiffs' opposition to defendant's motion, were appended to plaintiffs' sur-reply letter brief in violation of *Rule* 1:6–6.  *See* Pressler & Verniero, *Current N.J. Court Rules*, comment *R.* 1:6–6 (2014) ("It is also clear that mere appending of relevant documents to the motion brief does not constitute compliance with this rule.... Even more egregious is the attempted presentation of facts which are neither of record, judicially noticeable, nor stipulated, by way of statements of counsel made in supporting briefs, memoranda, or oral argument.  Such statements do not constitute cognizable facts.").  Moreover, it should be noted that plaintiffs' sur-reply, although received and considered by the court, was filed and served without leave of court. *See R.* 1:63(a).